UNITED STATES of America

v.

Jack H. PINCUS, M.D.

Crim. No. 77–201.

United States District Court,
W. D. Pennsylvania.

March 14, 1978.

David M. Curry, First Asst. U. S. Atty., Pittsburgh, Pa., for plaintiff.

Richard H. Martin, Pittsburgh, Pa., for defendant.

OPINION

MARSH, District Judge.

The defendant, Jack H. Pincus, M.D., has been named in an indictment charging him with one count of conspiracy in violation of

18 U.S.C. §371 and with seventeen counts of mail fraud in violation of 18 U.S.C. §1341. Dr. Pincus has moved to suppress certain evidence seized by federal agents during a search of his office at the Professional Complex, 3940 Northern Pike, Monroeville, on November 12, 1976, pursuant to a search warrant. Defendant asserts that the warrant was issued without sufficient probable cause, that the affidavit supporting the warrant contained material misrepresentations of fact, and that the affidavit contained no indicium of the reliability or credibility of the statements therein. It is also asserted that the agents unlawfully seized records and documents which were not within the scope of the warrant.

The search warrant, which issued upon an affidavit by Postal Inspector Barry E. Trainor, sought medical records maintained by Dr. Pincus in connection with his treatment of certain named individuals during designated time periods.[1] Inspector Trainor's affidavit states that he had been investigating the preparation of false medical reports and invoices by Dr. Pincus as part of schemes to defraud various insurance companies. Trainor had also investigated the involvement of Louis C. Boscia in securing false medical reports from various physicians in connection with the submission of false personal injury claims to various insurance companies. Boscia was convicted in this court at Criminal Nos. 75–04 and 76–124 on charges of conspiracy to defraud and of using the mails in furtherance of schemes to defraud insurance companies through the presentation of false medical reports and bills.[2] Paragraph 5 of Inspector Trainor's affidavit states:

"Evidence introduced at the trials of Louis C. Boscia at Criminal Nos. 75–04 and 76–124 and testimony at said trials established that since 1972 Louis C. Boscia has been well-known to Jack H. Pincus, M.D. Evidence further established that Boscia was the central figure in schemes devised and executed to defraud insurance companies through the presentation of false medical reports and bills and that Jack H. Pincus, M.D., provided medical reports and bills for treatment alleged to have been performed for claimants who, it was established, had sustained no injuries in any automobile accidents."

Defendant claims that Paragraph 5 contains affirmative misrepresentations of material facts which require the court to invalidate the search warrant. The records of Criminal Nos. 75–04 and 76–124, however, support the accuracy of the statements in the affidavit. Specifically, in Criminal No. 76–124, the evidence included a medical bill prepared by Dr. Pincus purporting to reflect his treatment of Robert Plusquellec. This bill had been submitted by Plusquellec to an insurance company as part of his claim for injuries sustained in an automobile accident on November 25, 1973 (No. 76–124; Government Ex. 9–B). At trial, it was proved by substantial evidence that neither Plusquellec nor any of the other claimants had suffered injuries as a result of that accident which in fact had been staged under the direction of Louis C. Boscia. Another claimant, Paul Scolieri, who had participated in the same staged accident, submitted to the insurance company a bill from Dr. Pincus for treatment in connection with the November 25, 1973 accident and a medical report from Dr. Pincus which diagnosed Scolieri's injuries as mouth and teeth damage, cervical sprain and lower

---

1. The search warrant described the property as:

   ". . . namely records of Jack H. Pincus, M.D. in connection with professional services rendered during the periods designated for individuals identified on Exhibit 'A' attached hereto . . ., said records including but not limited to appointment books, books of account, records of medical treatment, patient cards or charts, doctors notes, tests and test results, x-rays, medical reports, prescrip-

tions, bills and invoices which constitute evidence of violations of Sections 371 and 1341 of Title 18 U.S.C."

2. Louis C. Boscia has been named in the instant case as an unindicted co-conspirator. Dr. Pincus was named as a defendant in the conspiracy charged in Criminal No. 76–124, but he was granted a severance on the first day of trial when his attorney's wife became ill in Florida. Subsequently, the charges against Dr. Pincus were dismissed by the government.

lumbar strain, and which estimated Scolieri's total disability time as more than three months (No. 76–124; Government Exs. 8–A and 8–B).

■ Criminal No. 75–04 also focused on false insurance claims submitted following a staged automobile accident. In that trial, Herbert L. Lurie, Esquire, testified that Dr. Pincus had submitted medical bills purporting to show his treatment of three participants in an automobile accident staged in 1972. The testimony revealed that Dr. Pincus's bills had been delivered to the attorney's office by Louis Boscia and that the checks for Dr. Pincus had been given to Boscia for delivery to the doctor. Thus, the court finds no misstatement of any material facts in the affidavit, and defendant's misrepresentation argument must be denied.

■ Defendant argues that the magistrate had no means to judge the reliability or credibility of the hearsay evidence contained in the affidavit by Inspector Trainor. In particular, Paragraph 7 states that bills prepared by Dr. Pincus on November 21, 1974, in connection with insurance claims for an automobile accident on August 1, 1973, listed 22 office visits for Robert Bahl and 43 office visits for Linda Bahl, but that Robert Bahl had stated that he had seen the doctor only five times and that Linda Bahl had provided information that she had seen the doctor only four times. In Paragraph 9, the affidavit states that Dr. Pincus submitted bills in support of personal injury claims showing $420 due for 29 office visits by David Tolbert, $260 due for 23 office visits by his wife, Carol Tolbert, and $70 due for four visits by his son, David Tolbert, Jr. Paragraph 9 also states that, according to information provided by David Tolbert, Dr. Pincus actually saw the Tolberts on only one occasion at which time he provided no professional services.

The fact that Inspector Trainor has named his sources for this information in itself is not sufficient ground on which to presume credibility, but it is one factor which may be weighed in determining the sufficiency of the affidavit. *United States v. Spach,* 518 F.2d 866, 870 (7th Cir. 1975).

Another factor which weighs significantly is that these informants were patients of Dr. Pincus and were the very people who supposedly received the medical treatment which was the basis for the bills submitted to various insurance companies in support of personal injury claims. Furthermore, in stating that false bills were submitted to insurance companies on their behalf, these named informants appear to be admitting their own participation in criminal activity. As Chief Justice Burger recognized in *United States v. Harris,* 403 U.S. 573, 583, 91 S.Ct. 2075, 2082, 29 L.Ed.2d 723 (1971), "[a]dmissions of crime, like admissions against proprietary interests, carry their own indicia of credibility—sufficient at least to support a finding of probable cause to search."

■ Against this background, the specific facts alleged in the affidavit concerning Anthony Capizzi, Colette DiGiosio, Linda Alberti, Ross Orgera and Eugene Altieri support a finding of probable cause that the defendant's records would constitute evidence of the crime of mail fraud.

In the two instances where informants are not actually named, they are sufficiently identified (*i. e.,* employees of Dr. Pincus; attorney for Ernest A. Stevens, IV) in a manner which revealed that the relationship between the informants and the information they provided was a relationship from which Inspector Trainor could make a determination of credibility and reliability. Thus, the affidavit does contain the basic underlying circumstances from which Inspector Trainor concluded that the informants gave reliable information, and the magistrate was able to make a proper finding of probable cause. *Spinelli v. United States,* 393 U.S. 410, 415–416, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969); *Aguilar v. Texas,* 378 U.S. 108, 114, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964).

After entering the doctor's office pursuant to the search warrant on November 12, 1976, Inspector Trainor and the officers with him proceeded to search the various areas of the doctor's office. On top of a

box of old records in the supply room, Inspector Trainor located a pile of records which did not appear to be part of any organized file (Tr. 12). Attached to these records were copies of old bills and invoices, old treatment cards, and new treatment cards (Tr. 10). The records for the great majority of the individuals named in Exhibit A to the warrant were located in this pile in the supply room (Tr. 9). As Inspector Trainor went through these records, he noticed that in some instances the dates on what appeared to be old treatment cards did not correspond to the dates on the bills and medical reports in the pile for that particular patient, but that the dates on what appeared to be new treatment cards did correspond to the dates on the bills and reports (Tr. 32–36). While sorting through this pile of records, Inspector Trainor also noticed medical records for individuals, other than those listed on Exhibit A, who had become familiar to Trainor through his previous investigations as being people who were associated with Louis C. Boscia in some capacity. On the basis of the location of these records which appeared to have been separated from the normal filing system and placed in a pile with the records of people listed in the warrant as being involved in possible insurance fraud, and on the basis of the indications that the records were being rewritten to include information that had not been on them initially (Tr. 29–30), Inspector Trainor determined that the records of these additional persons, whom he knew to be associated with Boscia in some manner, constituted evidence of a crime. Inspector Trainor seized these records, in addition to the records listed in the warrant (Tr. 49).

Defendant alleges that the seizure of these records for additional individuals not named in the warrant was illegal. After consideration of the testimony, however, the court concludes that the warrantless seizure of these additional records falls within the "plain view" exception to the warrant requirement. In *Coolidge v. New Hampshire,* 403 U.S. 443, 466, 91 S.Ct. 2022, 2038, 29 L.Ed.2d 564 (1971), Justice Stewart outlined the "plain view" doctrine as it has been applied by the Court:

"What the 'plain view' cases have in common is that the police officer in each of them had a prior justification for an intrusion in the course of which he came inadvertently across a piece of evidence incriminating the accused. The doctrine serves to supplement the prior justification . . . and permits the warrantless seizure."

By virtue of the search warrant, Inspector Trainor was legitimately in the doctor's office to search the doctor's records. He was justified in looking through the pile of records found in the supply room, and, in fact, most of the records for the individuals listed in the warrant were found in that pile. In the course of locating those records specified in the warrant, Inspector Trainor came across records for other individuals who had become known to him during his investigations of insurance fraud schemes involving Louis C. Boscia. The very nature of Inspector Trainor's knowledge about most of these additional individuals was sufficient to make him suspect immediately that these additional records constituted evidence of criminal conduct by the defendant.

Specifically, Inspector Trainor recognized the name John Boscia as being a fictitious person and an alias which had been used at times by Louis C. Boscia. He recognized Louis Boscia, II as being the son of Louis C. Boscia and an individual who had been treated by numerous doctors other than Dr. Pincus for involvement in numerous automobile accidents. Trainor recognized Thomas Warren and Thomas Henning as being names used by an individual (Thomas Warren Henning) who had been convicted for his involvement in a fraudulent accident scheme in Criminal No. 75–03. The name Donna Boscia was recognized as an alias used by Donna Duffy who had been involved in the accident which was the subject of Criminal No. 75–03, and Trainor recognized the name Barbara Houmis as being Barbara Ross who was convicted in Criminal No. 75–04 as being part of a fake

accident scheme. Trainor recognized Roy Norris as the name of an individual who had pleaded guilty to participation in a staged accident in Criminal No. 75–03, and Trainor knew Robert Plusquellec and Paul Scolieri as individuals who had been convicted in Criminal No. 76–124 for involvement in a fraudulent accident scheme. Trainor knew that these last two men allegedly had been treated by Dr. Pincus, but the original records he found in the pile differed from the allegedly original record which previously had been submitted to the court as evidence (Tr. 42).

It appears from the evidence before the court that Inspector Trainor's search of the doctor's office pursuant to the warrant was conducted in a manner which minimized any unwarranted intrusion upon the doctor's privacy. See *Andresen v. Maryland,* 427 U.S. 463, 482 n. 11, 96 S.Ct. 2737, 49 L.Ed.2d 627 (1976). The additional records seized were not taken from what appeared to be the doctor's normal filing system, but rather were found piled curiously in the supply room among the very records which the warrant authorized Inspector Trainor to seize. The names on these additional records provoked immediate suspicion in Inspector Trainor's mind; there is no evidence that he used the warrant as a starting point for a general exploratory search in the hope that something incriminating would eventually emerge. *Coolidge v. New Hampshire,* 403 U.S. at 466, 91 S.Ct. 2022. The government's reliance on the "plain view" exception to the warrant requirement is justified in these circumstances.

Defendant's supplemental motion to suppress evidence will be denied.

An appropriate order will be entered.