UNITED STATES of America

v.

**Nicodemo SCARFO, a/k/a Nicholas Scarfo, a/k/a Nicholas Scarto.**

**Appeal of Nicodemo SCARFO.**

No. 81–2181.

United States Court of Appeals, Third Circuit.

Argued March 30, 1982.

Decided July 22, 1982.

Pamela W. Higgins (argued), Higgins & Madden, Robert F. Simone, Philadelphia, Pa., for appellant.

W. Hunt Dumont, U. S. Atty., Robert P. LaRusso, Sp. Asst. U. S. Atty. (argued), Maryanne Trump Desmond, Executive Asst. U. S. Atty., Newark, N.J., for appellee.

## OPINION OF THE COURT

Before GIBBONS, SLOVITER and BECKER, Circuit Judges.

SLOVITER, Circuit Judge.

Defendant, Nicodemo Scarfo, appeals from the judgment of conviction and sentence imposed following his conviction under 18 U.S.C. App. § 1202(a)[1] for possession

---

1. Section 1202(a), in pertinent part, provides: Any person who—

    (1) has been convicted by a court of the United States or of a State or any political subdivision thereof of a felony, ... and who receives, possesses, or transports in commerce or affecting commerce, after the date of enactment of this Act, any firearm shall be fined not more than $10,000 or imprisoned for not more than two years, or both.

of a firearm by a convicted felon. We affirm the conviction.

On December 23, 1979 at 2:00 a. m., investigators from the Atlantic County Prosecutor's Office[2] executed a search warrant at Scarfo's residence in Atlantic City, New Jersey. At the time of the search defendant was not at home. The warrant was issued by a county judge in connection with a state murder investigation and authorized the seizure of a "jogging suit and handgun/or property of the victim." App. at 8a. None of the items sought in the warrant were found at the residence. However, the investigators did seize the following items from the residence: (1) a .22 caliber derringer contained in an eyeglass case; (2) the bottom half of a blue jogging suit (not the one sought in the warrant); (3) a pair of eyeglasses contained in an eyeglass case; (4) a bulletproof vest; (5) an envelope containing newspaper clippings and police reports; (6) a list of telephone numbers and (7) miscellaneous pieces of paper.[3]

Scarfo was subsequently arrested, tried, and acquitted of the state murder charge. Thereafter, on January 20, 1981, he was indicted by a federal grand jury for violation of 18 U.S.C.App. § 1202(a)(1) by possession of the .22 caliber derringer seized at his residence on December 23, 1979. Scarfo filed a pretrial motion seeking to suppress the items seized by the investigators on December 23, 1979 on the ground, *inter alia*, that "the items seized were not those sought and named in the warrant." App. at 13a. The district court denied that mo-

tion, holding that "the items taken were lawfully seized under the plain view doctrine." App. at 59a.

Thereafter, trial commenced on April 6, 1981 and the jury returned a verdict of guilty on April 9, 1981. On appeal, defendant contends (1) that Exhibits 7(A) (the miscellaneous papers) and 7(B) (the telephone list) were illegally seized under the plain view doctrine and were erroneously admitted into evidence,[4] and (2) that prosecutorial misconduct requires reversal of the judgment of conviction and remand for a new trial.

■ To prove that Scarfo violated 18 U.S.C. App. § 1202(a) the government was required to prove beyond a reasonable doubt that defendant (1) had been convicted of a felony under the laws of the State of Pennsylvania, (2) thereafter knowingly possessed a firearm, and, (3) that his possession of the firearm was in or affected commerce. Evidence was introduced at trial that Scarfo pled guilty to involuntary manslaughter in Pennsylvania state court in 1964, a crime punishable under the laws of Pennsylvania at the time by imprisonment for more than two years and thus falling within 18 U.S.C. App. § 1202(c)(2), and that the derringer was manufactured in Illinois and sold by a gun dealer in Pennsylvania. The principal factual issue at trial stemmed from the government's attempt to establish that the derringer gun was constructively possessed by Scarfo. Defendant attempted to show through cross-examination that the gun be-

---

Section 1202(c)(2) defines "felony" as:
[A]ny offense punishable by imprisonment for a term exceeding one year, but does not include any offense (other than one involving a firearm or explosive) classified as a misdemeanor under the laws of a State and punishable by a term of imprisonment of two years or less.

**2.** Investigators Edward Hepburn, Anthony Porcelli, Andrew Allegretto and Lieutenant James Barber participated in the search of the Scarfo residence. Investigator Dennis McQuigan was stationed outside the residence during the search.

**3.** The inventory of property taken from the Scarfo residence, App. at 10a, indicates that in addition to these items a "marksman pellet

rifle" and two "switch blade knives" were also taken. No issue as to these items has been raised.

**4.** At trial the government was permitted to introduce the .22 caliber derringer; the two eyeglass cases and eyeglasses; the telephone list; and the miscellaneous papers. The police reports and newspaper clippings were not introduced into evidence. The government's attempt to introduce the bulletproof vest was denied by the district court. The appellant's challenge on appeal is limited to the introduction of the telephone list and the miscellaneous papers.

longed to Scarfo's wife, Dominica Scarfo. Defendant relied in large part on the testimony of County Investigator Hepburn that when Hepburn found the derringer in question during his search of the drawer of the bureau in the master bedroom of the Scarfo residence, Mrs. Scarfo stated that it was her gun.

Defendant does not argue on appeal that the evidence was insufficient to prove the requisite statutory possession by Scarfo. Instead he argues that some of the evidence which was introduced by the government to establish such possession was inadmissible because it had been illegally seized, and that, as a result, the conviction must be reversed. The evidence which is challenged is the "miscellaneous papers", introduced as Government Exhibit 7(A), which consists of 11 small pieces of paper on which are handwritten notations, sometimes on both sides, of names, numbers, or both, and includes one telephone call message "To Nick", App. at 264a–78a, and the "telephone list" introduced as Government Exhibit 7(B), two sheets of paper with names and telephone numbers. App. at 279–81a. Investigator Hepburn testified he found these papers along with other items in the same bureau drawer in which he found the derringer gun. *Id.* at 86a. The telephone list, Exhibit 7(B), is a photocopy of a telephone list written on both sides of yellow lined paper, Exhibit 7(B)(1), which was taken from Scarfo's wallet by Investigator McQuigan when he arrested Scarfo the morning following the search and seizure. *Id.* at 135a. Thus these exhibits tended to link Scarfo to the bureau drawer in which the derringer was found by the police. They have no independent significance in this case, and none was suggested.

■ Scarfo contends that the plain view exception to the requirement of a search warrant cannot be used to justify the seizure of Exhibits 7(A) and 7(B). Under the plain view exception, law enforcement authorities must have been lawfully on the premises, the discovery must have been inadvertent, and the incriminating nature of the item must have been immediately ap-

parent. *See Coolidge v. New Hampshire,* 403 U.S. 443, 464–73, 91 S.Ct. 2022, 2037–42, 29 L.Ed.2d 564 (1971). Scarfo contends that in this case the discovery was not inadvertent and the items seized could not be considered to be of an immediately apparent incriminating nature. The government responds that the testimony of Investigator Hepburn establishes both the inadvertence of the discovery and the incriminating nature of the evidence. Hepburn testified that he started his search for the items in the search warrant with the top of the bureau in the master bedroom, and when he didn't find anything of any evidential value he proceeded to search the top bureau drawer. App. at 28a–29a. After finding the derringer gun in that drawer, he resumed the search of that drawer and noticed "some pieces of paper which appeared to be records of some type, possibly loansharking records or bookmaking records. I seized them." *Id.* at 30a. The government argues that since these records were "with the gun and with the glass case [an eyeglass case in which the derringer was found which had been cut down and acted as a holster]," *id.* at 32a, they were discovered inadvertently. It also argues that the incriminating nature of the documents was apparent because Hepburn had had prior police training at "two organized crime schools" where he was taught how "different records ... are kept by bookmakers and loansharks", *id.* at 30a–31a, and that background, combined with Hepburn's knowledge that "Mr. Scarfo allegedly was involved in that type of activity, according to the police community", *id.* at 31a, suffices to establish the incriminating nature of the evidence for purposes of the application of the plain view doctrine.

■ It would be unnecessary for us to resolve this close question of the constitutionality of the seizure if the admission of the evidence would, in any event, be considered harmless. *Chambers v. Maroney,* 399 U.S. 42, 53, 90 S.Ct. 1975, 1982, 26 L.Ed.2d 419 (1970). Application of the harmless error doctrine requires the court to "be able to declare a belief that it was

harmless beyond a reasonable doubt", *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967), an inquiry similar to "whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction." *Fahy v. Connecticut*, 375 U.S. 85, 86–87, 84 S.Ct. 229, 230, 11 L.Ed.2d 171 (1963).

This court has had several occasions to apply the harmless error doctrine when the evidence which was admitted on appeal was claimed to have been obtained in violation of the Fourth Amendment. *See, e.g., United States ex rel. Riffert v. Rundle*, 464 F.2d 1348, 1352 (3d Cir. 1972), *cert. denied*, 415 U.S. 927, 94 S.Ct. 1434, 39 L.Ed.2d 484 (1974); *United States v. Gimelstob*, 475 F.2d 157, 161 (3d Cir.), *cert. denied*, 414 U.S. 828, 94 S.Ct. 49, 38 L.Ed.2d 62 (1973). In *United States v. Vallejo*, 482 F.2d 616, 618 (3d Cir. 1973), *cert. denied*, 416 U.S. 940, 94 S.Ct. 1944, 40 L.Ed.2d 292 (1974), this court eschewed as unnecessary and thus inappropriate the "intellectually alluring" question of the legality of the seizure of certain evidence because we determined that the mass of evidence aside from the challenged evidence was overwhelming against the defendant. Therefore we affirmed the conviction on the ground that the admission of the "fruit" of the allegedly unlawful search was harmless beyond a reasonable doubt.

More recently, in *United States v. Molt*, 615 F.2d 141 (3d Cir. 1980), we considered defendant's contention that his conviction for violation of the Tariff Act by knowingly importing reptiles should be reversed on the ground that records obtained from a company to which defendant allegedly sold six imported iguanas were fruits of an illegal seizure. This court, in an opinion authored by Judge Gibbons, applied the harmless error doctrine because the allegedly tainted evidence was "merely cumulative", "was not needed to establish defendant's guilt", "its admission could not ... have influenced the trial judge's determination" and "there is overwhelming evidence of guilt apart from [that which was challenged]." *Id.* at 146. The government had produced

abundant untainted evidence in the form of testimony from Molt's co-conspirators that was probative of Molt's involvement in the smuggling operation and established that he knowingly imported the reptiles contrary to the Tariff Act.

Turning then to the inquiry as to whether the admission of the miscellaneous papers and the telephone list could be viewed as harmless error, we must first examine the purpose for which they were used when introduced. They were used in the summation of the prosecutor as additional evidence to "establish the fact that that drawer [where the gun was found], that dresser was that of the defendant and that it was under his control." App. at 222a. Had this been the only evidence or the principal evidence to establish a nexus between defendant Scarfo and the dresser drawer, we should be obliged to consider the constitutionality of the seizure. However, there was abundant other evidence to establish Scarfo's connection to that drawer.

Investigator Hepburn testified that his search of the Scarfo residence began in the master bedroom. In the top drawer of the bureau in that bedroom he found an eyeglass case, which contained a pair of eyeglasses, and another eyeglass case "cut down to act as a holster", which contained the .22 caliber derringer. App. at 78a–79a. The two eyeglass cases were attached to each other by a rubber band which was wrapped around them. *Id.* at 79a. When Hepburn removed these items from the drawer, Mrs. Scarfo stated that the gun belonged to her, but admitted that the eyeglasses belonged to her husband. *Id.* An optician, Robert Foerster, testified that the eyeglasses seized were identical to a pair of bifocals which his records indicated were prepared for Scarfo. Tr. at 212–13 (April 7, 1981).

Hepburn further testified that in the same drawer in which he found the gun he recalled seeing the defendant's passport and "male socks." App. at 79a. The passport, which contained Scarfo's photograph,[5] was

---

5. The passport was not seized at the time of

the December 23, 1979 search and was surren-

introduced into evidence at the trial and identified by Investigator Hepburn as the same passport he observed in the drawer at the time of the search. *Id.* at 81a.

Hepburn stated that he did not recall seeing any female clothing in the drawer in which he found the gun. *Id.* at 79a–80a. He seized the bottom part of a jogging suit from another drawer in the dresser and described the clothing in the rest of the dresser as "male clothing." *Id.* at 118a. Hepburn also testified that he searched the closet next to the bureau and found numerous male suits, shoes and shirts. *Id.* at 192. He characterized the closet as "a male's closet, all male clothing in it and shoes." *Id.* at 193a. He stated that he recalled seeing no female clothing in the room. *Id.*

Investigator Andrew Allegretto testified that he searched a smaller bedroom in the Scarfo residence located about five feet from the master bedroom, and "all the belongings in there appeared to belong to a woman." Tr. at 43 (April 8, 1981). He stated that he searched both the dresser and the closet and found "woman's clothing." *Id.* at 44.

■ We believe that there was overwhelming evidence that the drawer in which the gun was found contained at least some personal effects belonging to defendant Scarfo. The defense sought to show through cross-examination that the police officers made a selective search, that they were not looking for any items of Mrs. Scarfo's, and that therefore their failure to recall or to seize any items of Mrs. Scarfo from the drawer did not establish her lack of possession of the gun. This, of course, was an issue for the jury which rejected the defense theory after hearing the respective arguments.[6] Significantly, defendant's counsel did not argue to the jury that none of the items in the dresser drawer belonged to Scarfo, an argument which would have

been difficult to make in light of the presence of Scarfo's passport. The presence of two additional items connecting the defendant to the drawer, which were not so physically large as to exclude the possibility that Mrs. Scarfo's effects could also have been there or so personal in nature as to preclude the argument that the drawer may have been shared, was at most cumulative to show Scarfo's use, at least in part, of that drawer. In light of the fact that the gun was found in an eyeglass case attached by rubber band to another eyeglass case which contained eyeglasses which were admittedly Scarfo's, in a drawer which contained Scarfo's passports and male clothing, it strains credulity to conclude, as the dissent does, that the telephone list found in the same drawer "is clearly the strongest" circumstantial evidence suggesting that the gun was Scarfo's. Dissenting typescript op. at 3. Under the circumstances of this case, we believe application of the harmless error doctrine is appropriate. Therefore, we do not reach the Fourth Amendment issue to which the dissent is directed.

■ Defendant's claim of prosecutorial misconduct has two parts. The first focuses primarily upon the testimony by Investigator Hepburn on redirect examination that the search was conducted as part of a "major investigation" which involved "a majority of the investigators of the special prosecutors' unit of the Atlantic County Prosecutor's Office." App. 114a–115a. Scarfo argues that this information was "wholly gratuitous" on the part of the government, was irrelevant to the charge before the jury and "can only have been intended by the government to prejudice the jurors against this defendant." Appellant's brief at 11. He analogizes this conduct to that considered in *United States v. Blanton*, 520 F.2d 907 (6th Cir. 1975). In *Blanton*, during a trial of a defendant also

dered by Scarfo at the time of his bail hearing before the district court.

**6.** The jury was instructed without objection that a finding that defendant actually or constructively possessed the gun jointly with his wife would be sufficient to satisfy the posses-

sion element of the crime. Tr. at 109 (April 9, 1981). Thus, evidence establishing that certain items in the drawer belonged to Mrs. Scarfo would not necessarily be inconsistent with a finding that Scarfo shared constructive possession of the gun with his wife.

charged with violation of 18 U.S.C.App. § 1202(a)(1), a government agent had testified that the firearm was seized during a search for guns. Questioning of two prosecution witnesses elicited testimony that defendant was under investigation for bank robbery. The court of appeals ordered a new trial after finding that "[t]he deliberate injection of testimony concerning another wholly unrelated offense ... was error." *Id.* at 910.

The facts of the *Blanton* case are distinguishable from those before us because in *Blanton*, unlike this case, the jury was told both that defendant was the target of an investigation and the nature of the offense for which he was being investigated. In this case the jury might have deduced that Scarfo was under investigation for something since they already knew that five investigators came to his apartment at 2:00 a. m. to execute a search warrant authorizing seizure of a hand gun and a jogging suit. However, they were not told that he was, in fact, a target or that he was being investigated for murder. Therefore, the line of cases dealing with the issue of introduction of evidence of other crimes has no applicability here.

The government claims that it was necessary for it to elicit the testimony about the investigation to show that the investigators had a legitimate purpose for being on the premises. It contends this was needed to rebut the defense attorney's cross-examination of Investigator Hepburn in which the defense sought to demonstrate that Hepburn was looking for items which would tie the defendant, but not Mrs. Scarfo, to the derringer. The government argues that it sought to rehabilitate its witness by demonstrating that there was an independent legitimate purpose for the witness' action in seizing certain items of evidence and not others.

Even if the prosecutor's questions and the responses went somewhat beyond that necessary to meet this objective, the matter was adequately cured by the cautionary instruction given by the trial court on this point. Judge Brotman instructed the jury:

No testimony was received during the trial nor evidence introduced about the defendant, Nicodemo Scarfo, being other than a target or subject of the investigation mentioned. I instruct you that you are not to consider such testimony as bearing on any of the issues in this case, nor are you to draw any inferences from the mention of such investigation.

In this case you must decide the defendant's guilt or innocence solely on this charge. You are instructed not to consider any evidence not relative to this issue.

Tr. at 110–111 (April 9, 1981).

Defendant's other claim of prosecutorial misconduct is that the prosecutor improperly injected his personal opinions and beliefs during his summation. In *United States v. LeFevre*, 483 F.2d 477, 478–79 (3d Cir. 1973), we adopted Standard 5.8(b) of the American Bar Association's Prosecution Standards which provides that "[i]t is unprofessional conduct for the prosecutor to express his personal belief or opinion as to the truth or falsity of any testimony or evidence of the guilt of the defendant." We stated that such comments, if based on the evidence, are not reversible errors per se.

On several occasions during the prosecutor's closing argument he expressed his personal belief and views as to certain evidence. In each instance when the defense counsel objected, the prosecutor apologized, and the court gave a cautionary instruction. App. at 208a–209a; App. at 214a. On one occasion, the prosecutor told the jury:

It is your decision in the case and the objection was proper and I will try to refrain from doing it during the course of my argument. I apologize. If I use that phrase, forgive me and remember the court's admonition.

App. at 209a. In addition to the immediate cautionary instruction which the court gave, the court charged the jury in a manner which helped dispel any improper inferences which might have been drawn from the prosecutor's comment.

In rejecting the defendant's post-trial motions, the court found that these statements were not shown to have prejudiced the jury. We have reviewed the entire transcript including the prosecutor's initial remarks, his apology, the court's cautionary instructions, and the court's charge, and agree that the statements did not constitute such misconduct as to warrant a new trial.

In considering a defendant's contention that a prosecutor's remarks in summation were improper, it is important to keep in mind that the appropriate inquiry is whether such remarks, in the context of the entire trial, were sufficiently prejudicial to violate defendant's due process rights. Although we have more latitude on direct appeal when we can exercise our supervisory power than we have on reviewing a claim on habeas corpus, *see Donnelly v. DeChristoforo*, 416 U.S. 637, 639, 642–43, 94 S.Ct. 1868, 1869, 1871, 40 L.Ed.2d 431 (1974); *United States ex rel. Perry v. Mulligan*, 544 F.2d 674, 678 (3d Cir. 1976), *cert. denied*, 430 U.S. 972, 97 S.Ct. 1659, 52 L.Ed.2d 365 (1977), the focus must still be upon the fairness of the trial. Our review convinces us that the prosecutorial conduct complained of did not rise to a level which compromised defendant's right to a fair trial.

For the foregoing reasons we will affirm the judgment of conviction.

GIBBONS, Circuit Judge, dissenting:

I join in the opinion of the court insofar as it addresses and rejects Mr. Scarfo's contention that his conviction should be reversed for prosecutorial misconduct. I cannot, however, join in the majority conclusion that the fourth amendment violation which Scarfo alleges was harmless beyond a reasonable doubt. Since I am convinced that the admission of the telephone number list could have influenced the outcome of the jury's deliberations I must consider whether that evidence was lawfully obtained. I conclude that it was not, and thus I would reverse the conviction and order a new trial.

I.

The majority's harmless error analysis proceeds upon the assumption that the evidence to which Mr. Scarfo objected was in fact obtained in violation of the fourth amendment. In order to sustain his conviction despite that assumption this court must apply the rule laid down in *Chapman v. California*, 386 U.S. 18, 25–26, 87 S.Ct. 824, 828–29, 17 L.Ed.2d 705 (1967):

> And though the case ... presented a reasonably strong "circumstantial web of evidence" against the petitioners ... it was also a case in which, *absent the constitutionally forbidden comments, honest, fair-minded jurors might well have brought in not-guilty verdicts*. Under these circumstances, it is completely impossible for us to say that the *State has demonstrated*, beyond a reasonable doubt, that the prosecutor's comments and the trial judge's instructions *did not contribute to petitioners' convictions*.

(Emphasis supplied).

The *Chapman* rule thus places the burden upon the government, not to establish that there was sufficient other evidence to convict, but to establish that the constitutional violation did not contribute to the verdict because no fair-minded juror could vote for a not-guilty verdict. This court has so interpreted *Chapman*. In *Government of the Virgin Islands v. Bell*, 392 F.2d 207, 209 (3d Cir. 1978), we observed:

> While the evidence introduced to convict Bell was adequate to support the jury's verdict, we cannot confidently assert that the district court's authorization to the jury to consider the inferences from the defendant's failure to testify had no effect on the outcome of the verdict. That the jury may have been so influenced is not rebutted by the government.

The "could not have influenced the factfinder's determination" test was reiterated as recently as *United States v. Molt*, 615 F.2d 141, 146 (3d Cir. 1980).

In considering whether the government has established beyond a reasonable doubt that the jury was not influenced by the

illegally obtained evidence, the first point which must be noted is that its case against Mr. Scarfo was entirely circumstantial on the sole matter in dispute. That matter was Mr. Scarfo's possession of a gun found in a dresser drawer in a bedroom he shared with his wife. In the government's case it was established that at the time of the seizure Mrs. Scarfo claimed to be the owner. There was no evidence of any admission of ownership or possession by Scarfo[1] and no direct evidence of either. The government's case required that the jury infer his possession from a totality of circumstances. Those circumstances, as the majority correctly observes, include the fact that the dresser drawer in which the gun was found contained some other personal property of Scarfo, and that most of Mrs. Scarfo's personal belongings were in another location. Undoubtedly the jury could have inferred from those circumstances that Mrs. Scarfo lied when she claimed ownership of the gun. That, however, is not the test. The government must establish beyond a reasonable doubt that in drawing that inference the jury did not rely at all upon the illegally obtained evidence.

For several reasons the government has failed to meet that burden. First, the gun was found in close proximity to Exhibit 7(B), a photocopy of a telephone list, the original of which was later found in Mr. Scarfo's wallet. Of all the circumstantial evidence suggesting that the gun was his, the duplicate telephone list found in close proximity to it in the same drawer is clearly the strongest. In order to conclude that the jury was not influenced by that evidence we would have to conclude, against reason and common sense, that each juror, in drawing the inference that Mrs. Scarfo lied about her ownership, disregarded the strongest piece of circumstantial evidence in the case.

As the case comes to us, moreover, the government is in no position to argue that the jury did not rely on the illegally obtained evidence in drawing the necessary infer-

ence. First, it urged the trial court to admit the telephone list, over objection, on the ground that it was relevant to his possession of the gun. As the majority notes, its only relevance is as circumstantial evidence of Mr. Scarfo's possession. Second, in its closing argument the government urged the jury to consider the list to "establish the fact that the drawer, that the dresser was that of the defendant and that it was under his control." App. 22a. In order to prevail under *Chapman* the government must persuade us beyond a reasonable doubt that the trial judge, an eminently reasonable man, made an unreasonable ruling on relevancy, and that the jury rejected the argument that the reasonable prosecutor persuasively advanced. I am not so persuaded. Indeed, I am persuaded to a moral certainty that the jurors did rely upon the strongest piece of circumstantial evidence in the case, as both the trial judge and the prosecutor anticipated they would.

In short, what the majority has done is to disregard the *Chapman* rule and apply a quite different test, which lifts the government's burden of establishing that the jury did not rely upon the illegally admitted evidence and requires a showing by the defendant that had the evidence been excluded the verdict would have been otherwise. Neither the Supreme Court's precedents nor ours permit that result.

One final observation is in order. The conventional wisdom supporting the exclusionary rule is the deterrence of police misconduct. I have noted elsewhere that this conventional justification is less than satisfactory. *See, e.g., United States v. Christine,* 687 F.2d 749, 760 (3d Cir. 1982) (Gibbons, J., concurring). But accepting the deterrence rationale, the application of a harmless error rule to illegally obtained evidence is so inconsistent with that justification as to be irrational. As the majority observes, this court nevertheless on several occasions made a harmless error analysis in fourth amendment contexts. *E.g., United States v. Molt,* 615 F.2d 141, 146 (3d Cir.

---

1. *Compare* Milton v. Wainwright, 407 U.S. 371, 92 S.Ct. 2174, 33 L.Ed.2d 1 (1972) (admission of statement illegally obtained but cumulative of three other full confessions lawfully obtained).

1980); *United States v. Vallejo*, 482 F.2d 616, 618 (3d Cir.), *cert. denied*, 414 U.S. 830, 94 S.Ct. 61, 38 L.Ed.2d 65 (1973); *United States v. Gimelstob*, 475 F.2d 157, 161 (3d Cir.), *cert. denied*, 414 U.S. 828, 94 S.Ct. 49, 38 L.Ed.2d 62 (1973); *United States ex rel. Riffert v. Rundle*, 464 F.2d 1348, 1352 (3d Cir. 1972), *cert. denied*, 415 U.S. 927, 94 S.Ct. 1434, 39 L.Ed.2d 484 (1974). Those precedents, inconsistent as they are with the deterrence rationale, nevertheless authorize application of a harmless error analysis to fourth amendment violations. Were the question open I would hold that the *Chapman* rule should never be applied on direct appeal to justify the participation by the trial court and the prosecutor in an ongoing invasion of privacy. But the precedents referred to are no authority for the gross distortion of the *Chapman* rule which the majority perpetrates.

## II.

Since I cannot conscientiously conclude that the *Chapman* test has been met, I turn to Mr. Scarfo's fourth amendment contention, which is that certain exhibits admitted in evidence were illegally seized on December 23, 1979.

On that date investigators from the Atlantic County Prosecutor's Office executed a search warrant at the Scarfo home. The warrant, issued in connection with a state murder investigation, authorized a search for a jogging suit and handgun. None of the items specifically named in the warrant were seized, but other items, including a pair of eyeglasses, a .22 caliber derringer, papers and a list of telephone numbers were taken from the bureau drawer in the master bedroom.

The search began with the top of the bureau. After finding nothing there, Edward Hepburn, the investigator in charge of the search, opened the top dresser drawer. He first found Mr. Scarfo's passport and two eyeglass cases attached together with a rubber band. One of the eyeglass cases contained the revolver. Mrs. Scarfo,

who was present, stated that the eyeglasses were her husband's, but that the gun belonged to her, and the investigator resumed his search of the drawer. Mr. Scarfo was not present during the search. Hepburn testified that he next noticed scraps of paper which, based on his training and experience, appeared to be loansharking and bookmaking records. (App. 30a–31a). Hepburn testified that he knew that "Mr. Scarfo allegedly was involved in that type of activity, according to the police community." (App. 31a). According to Hepburn, the pieces of paper were "with the gun and with the glass case," and below the scraps of paper, Hepburn found a copy of a list of telephone numbers. (App. 32a–33a). The original of the telephone list was found later in Scarfo's wallet.

On January 20, 1981, a federal grand jury returned a one-count indictment charging Scarfo with possession of a weapon in violation of 18 U.S.C. app. § 1202(a)(1), (1969), which makes it unlawful for a convicted felon to possess a firearm.[2] Prior to trial, Scarfo filed a motion to suppress all items seized in the search as being neither named in the warrant nor within its scope. The district court denied the motion to suppress on the ground that all of the items not mentioned in the warrant were in plain view and thus were lawfully seized. (App. 41a). A jury trial was held beginning on April 9, 1981.

The government concedes, as it must, that seizure of the items was not specifically authorized by the warrant. (Appellee's Brief at 26). It argues, however, that the telephone list and miscellaneous papers were inadvertently discovered and immediately recognized as incriminating during the course of an otherwise lawful search, and that seizure of the items was therefore authorized under the plain view doctrine.

In *Coolidge v. New Hampshire*, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971), the Supreme Court held that under the plain view doctrine it was permissible for police to seize items found while executing a

---

2. It is undisputed that in 1964 Scarfo had pled guilty to manslaughter in Philadelphia and had been sentenced to not less than six nor more than 23 months.

search warrant naming other objects. *Coolidge*, however, did not establish that anything in view can be seized. The police must come across the object not named in the warrant during the course of a search of proper scope and intensity. In addition, the article seized must be of an incriminating character, it must be immediately apparent to the police that it is incriminating, and the police must have come upon the evidence inadvertently. *E.g., United States v. Antill*, 615 F.2d 648 (5th Cir.), *cert. denied*, 449 U.S. 866, 101 S.Ct. 200, 66 L.Ed.2d 85 (1980); *United States v. Sanders*, 631 F.2d 1309 (8th Cir. 1980), *cert. denied*, 449 U.S. 1127, 101 S.Ct. 946, 67 L.Ed.2d 114 (1981); *United States v. Schire*, 586 F.2d 15 (7th Cir. 1978).

Appellant Scarfo concedes that the county investigators were lawfully on the premises to search for a handgun and a jogging suit but maintains that the seizure of the other items was not inadvertent and that the incriminating nature of the items was not immediately apparent. (Appellant's Brief at 33).

### A. The "Immediately Apparent" Requirement

The case law does not clearly establish the extent to which police may go in examining an item to determine whether it is incriminating. While it is clear that under *Stanley v. Georgia*, 394 U.S. 557, 89 S.Ct. 1243, 22 L.Ed.2d 542 (1969) (Stewart, J., concurring), police cannot remove film from containers and view it on a projector, Justice Stewart's opinion in *Stanley v. Georgia* has not been interpreted as prohibiting all examination of an article. It is generally assumed that there is nothing improper in merely picking up an article for the purpose of noting identifying characteristics found on the surface; a "casual" inspection is permitted, but a "close" inspection is not.[3] *United States v. Roberts*, 619 F.2d 379 (5th Cir. 1980). The line between a permissible examination and an overly intrusive one is

thin and poorly defined. In *United States v. Roberts,* police officers obtained a warrant to search for stolen property and while on the premises observed tables set up with football score sheets, phones and calculators. The police inspected the football scoresheets by a "mere glance." Once alerted to the existence of a bookmaking operation, they had probable cause to believe the items on the table were evidence of crime and could therefore seize them. 619 F.2d at 381.

Cases involving address books go somewhat further than *Roberts*, and generally hold, at least in conspiracy cases, that police may page through the book before seizing it. In *United States v. Diecidue*, 603 F.2d 535, 559 (5th Cir. 1979), *cert. denied*, 445 U.S. 946, 100 S.Ct. 1345, 63 L.Ed.2d 781 (1980), the fifth circuit affirmed the denial of a motion to suppress address books, because the police were investigating a conspiracy, and the investigator "recognized that the address books might be of significance before he leafed through them." 603 F.2d at 559; *see also United States v. Hillyard*, 677 F.2d 1336, 1342 (9th Cir. 1982); *United States v. Phillips,* 593 F. 2d 553 (4th Cir. 1978), *cert. denied*, 441 U.S. 947, 99 S.Ct. 2169, 60 L.Ed.2d 1050 (1979).

Similarly, in *United States v. Crouch*, 648 F.2d 932 (4th Cir.), *cert. denied*, 454 U.S. 952, 102 S.Ct. 491, 70 L.Ed.2d 259 (1981), a case upon which the government relies, the Fourth Circuit upheld a ruling admitting in evidence letters containing a formula for manufacturing drugs which were seized during a search authorized by a warrant for paraphernalia used in drug manufacture. The court attached no significance to the fact that "a cursory reading" of the letters was necessary to establish their incriminating nature. Even though there was nothing incriminating about the envelopes in which the letters were discovered, the court noted that the agents "acted within the scope of the search warrant in removing the letters from those envelopes to search for

---

**3.** The prohibition of a close inspection applies only to items not already in police custody. If there is probable cause to seize an article, once it is in custody, police may properly inspect it. United States v. Duckett, 583 F.2d 1309, 1313 (5th Cir. 1978).

the chemicals and paraphernalia named in the warrant." *Id.* at 933.[4]

In other cases, courts have rejected a plain view justification for seizure of items when the investigator had to conduct a more searching inspection of the item. In *United States v. Scios*, 590 F.2d 956, 963 n.15 (D.C.Cir.1978) (en banc), the court held that the agent unlawfully riffled through defendant's file folders, located on a countertop in wire stands. The labels on the folders were not plainly visible; the agent had to bend over, thumb through the files and finger them so that their labels could be read. The agent was lawfully on the premises pursuant to an arrest warrant, and was looking for "nothing in particular" when he focused on the file folders.[5] *Id.* at 958; *see also United States v. Robinson*, 535 F.2d 881, 885–86 (5th Cir. 1976) (not plain view when officer had to open brown paper bag to inspect envelopes inside). Most cases also hold that an investigator cannot write down an item's identifying characteristics, such as a serial number, and check it later. *United States v. Clark*, 531 F.2d 928 (8th Cir. 1976) (officers authorized to search for drugs could not seize pistol, check serial number and prosecute defendant for firearms violation); *United States v. Gray*, 484 F.2d 352 (6th Cir. 1973), *cert.*

*denied*, 414 U.S. 1158, 94 S.Ct. 916, 39 L.Ed.2d 110 (1974) (where warrant authorized search for illegally stored beer, officers could not seize rifle and later check serial number). *But cf. United States v. Schire*, 586 F.2d at 18–19 (looking at serial number permissible; immediately apparent requirement means apparent without information other than that which officers properly possessed before the search was over). In a more extreme case, *United States v. Dichiarinte*, 445 F.2d 126 (7th Cir. 1971), a defendant consented to a search of his house for narcotics. During the search, the agents went far beyond the scope of the defendant's consent by opening and reading through his personal papers "to determine whether they gave any hint that defendant was engaged in criminal activity."

This case falls between cases such as *United States v. Dichiarinte* and *United States v. Roberts*. Here, the evidence was not fully exposed to view, as in *Roberts*, but Investigator Hepburn was authorized to be in the drawer at the time when he found the papers. Thus, the issue is whether the contents of the phone list and other papers were "immediately apparent" in light of the fact that Hepburn had to examine the papers before coming to the conclusion that they were incriminating.

**4.** The government also relies on United States v. Ochs, 595 F.2d 1247 (2d Cir.), *cert. denied*, 444 U.S. 955, 100 S.Ct. 435, 62 L.Ed.2d 328 (1979). In *Ochs*, during a warrantless investigation of a car allegedly involved in a travelers' checks theft ring, police opened and looked at contents of an unlocked briefcase, which were "on their face" records of a loansharking operation and a house of prostitution. The Second Circuit noted that plain view can include some perusal, generally fairly brief, of documents to perceive the relevance of the document to crime. *Id.* at 1257 n.8. *Ochs'* discussion of plain view does not elaborate on the extent to which the police may examine an item.

**5.** There are cases in courts of appeals pointing the other way. In United States v. Sedillo, 496 F.2d 151 (9th Cir.), *cert. denied*, 419 U.S. 947, 95 S.Ct. 211, 42 L.Ed.2d 168 (1974), defendant was stopped on the street by a police officer. The officer noticed an envelope which appeared to contain a treasury check addressed to someone else sticking out of defendant's pocket. The officer removed the check, noticed that it had been endorsed, compared the

endorsement with a sample of defendant's handwriting, and arrested defendant for forgery. The Ninth Circuit decided that the officer had probable cause at the time he seized the envelope, and upheld the seizure based on plain view. Judge Hufstedler dissented, arguing that the incriminating aspects of the check were not apparent until after the officer removed the check from defendant's pocket. Three members of the Supreme Court agreed, and dissented from a denial of certiorari, 419 U.S. 947, 95 S.Ct. 211, 42 L.Ed.2d 168 (1974). Similarly, in United States v. Gentile, 419 U.S. 979, 95 S.Ct. 241, 42 L.Ed.2d 191 (1974), police were searching defendant's home for stolen goods when an officer noticed a check payable to someone else laying under some clothing. The officer seized the check and later learned it was stolen. The fifth circuit, without opinion, affirmed the district court's decision to allow the check into evidence. 493 F.2d 1404 (5th Cir. 1974). Certiorari was denied, with Justice Douglas, joined by Justice Marshall, dissenting.

The search warrant in this case authorized Hepburn to look for a gun and a jogging suit and, unlike the officers in *United States v. Crouch* and *United States v. Diecidue*, Hepburn was not acting within the scope of the search warrant in examining the papers. There is no indication in the record, however, that the papers were in an envelope, bag, folded up or otherwise concealed. Hepburn did not have to take information back to headquarters, analyze it, or conduct any further search of the premises; he merely had to look at the papers to be able fully to view their contents.[6] *See United States v. Schire*, 586 F.2d 15 (7th Cir. 1978). In light of the minimal and casual nature of the inspection necessary to ascertain the contents of the papers, the "immediately apparent" requirement, in my view, poses no obstacle to application of the plain view doctrine.

### B. Probable Cause

The requirement that an article be incriminating in character has proved troublesome for the courts. Since *Warden v. Hayden*, 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967), an article need not be inherently incriminating; the "incriminating nature" of an object is generally deemed apparent where police have probable cause to believe it is evidence of crime. *United States v. Strahan*, 674 F.2d 96, 100 (1st Cir. 1982); *United States v. Ochs*, 595 F.2d at 1258; *United States v. Duckett*, 583 F.2d 1309, 1313–14 (5th Cir. 1978); *United States v. Johnson*, 541 F.2d 1311, 1316 (8th Cir. 1976); *United States v. Truitt*, 521 F.2d 1174 (6th Cir. 1975). *See also* 2 LaFave, Search & Seizure § 4.11 at 167 (1978). Although courts often are not explicit in articulating the test they are applying, a proba-

ble cause standard seems to be the most often used and preferable one.[7] *E.g., United States v. Johnson*, 541 F.2d 1311 (8th Cir. 1976). Requiring any less of a connection between items which are not inherently incriminating and some criminal activity could authorize wholesale seizures, since the police often find many items during the course of a warrant search which could possibly (as opposed to probably) later turn out to have evidentiary value. *See* 2 LaFave, Search & Seizure § 4.11 at 169 (1978).

The cases do not establish precisely what nature or degree of connection between an item and some criminal activity is required for probable cause. In some cases, determinations of sufficient cause to believe the item was incriminating have been based on the fact that the items seized were of the same type as those named in the warrant. *E.g., United States v. Golay*, 502 F.2d 182 (8th Cir. 1974) (warrant issued for stolen property; police justified in seizing other property believed to have been stolen); *United States v. Kuntzweiler*, 487 F.2d 426 (9th Cir. 1973), *cert. denied*, 417 U.S. 910, 94 S.Ct. 2608, 41 L.Ed.2d 214 (1974) (police search for one type of controlled substance and find another). In other cases, seizures of unnamed items have been justified on the basis of the item's clear relationship to the crime under investigation, *e.g., United States v. Diecidue*, 603 F.2d 535, 559 (5th Cir. 1979), *cert. denied*, 445 U.S. 946, 100 S.Ct. 1345, 63 L.Ed.2d 781 (1980) (seizure of address book justified because crimes being investigated included conspiracy); *United States v. House*, 604 F.2d 1135, 1143 n.10 (8th Cir. 1979), *cert. denied*, 445 U.S. 931, 100 S.Ct. 1320, 63 L.Ed.2d 764 (1980) (incriminating nature of photograph of car arguably relevant in investigation involving

---

**6.** None of the papers constituting Exhibit 7A measure larger than 3 inches by 5 inches. App. 264a–279a. They appear to have been simply laying in the drawer. Exhibit 7B, the phone list, appears to cover two sides of a piece of paper. App. 280a–281a. Officer Hepburn described them as "scraps of paper" laying in the drawer.

**7.** Some courts have applied what appears to be a slightly lesser standard and have required

only a "reasonable relation" to the purpose of the search or a "nexus" between the seized item and the criminal behavior under investigation. *E.g., United States v. Barber*, 495 F.2d 327 (9th Cir. 1974); *United States v. Wolfe*, 375 F.Supp. 949 (E.D.Pa.1974). This standard has only been applied in cases where the item seized related to the crime under investigation. That is not the case here.

stolen cars but not in investigation for drugs); *United States v. Schire*, 586 F.2d at 18 (where officers investigating auto theft ring, proper to check car's identification number); *United States v. Griffin*, 530 F.2d 739, 744 (7th Cir. 1976) (evidentiary nature of mail strewn about apartment apparent when officers investigating reports of stolen mailbag); or the location of the item, *United States v. Pincus*, 450 F.Supp. 66, 70 (W.D.Pa.1978) (seizure proper of records located outside normal filing system next to records sought in insurance fraud scheme).[8]

Although the courts thus appear to consider all the circumstances in determining whether there was probable cause to believe the item was a fruit, instrumentality or evidence of crime, seizure must be based on more than mere suspicion and must be supported by objective facts. *See United States v. Ochs*, 595 F.2d at 1258; *United States v. Benn*, 441 F.Supp. 1268 (E.D.N.Y.1977). *Cf. Brinegar v. United States*, 338 U.S. 160, 175, 69 S.Ct. 1302, 1310, 93 L.Ed. 1879 (1949) (car search).

In this case, the record is devoid of facts upon which the police could base probable cause for seizing the papers. As a justification for the seizure, the government argues that the records were evidence that Scarfo had committed the separate crimes of bookmaking or loan sharking. Hepburn's testimony as to why he had probable cause to believe the records were evidence of these crimes consists of his testimony on direct examination:

Q: The other items that you seized, briefly describe them to the Court, would you please?

A: Upon looking through that drawer, I seen some pieces of paper which appeared to be records of some type, possibly loan sharking records or bookmaking records. I seized them.

Q: Have you ever had experience in examining and determining documents to be either loanshark or gambling records?

A: I have been in two organized crime schools and I'm aware, they went over different records that are kept by bookmakers and loansharks.

Q: Did you have any prior knowledge whether or not Mr. Scarfo was ever involved in either of those two types of operations?

\*     \*     \*     \*     \*     \*

A: Mr. Scarfo allegedly was involved in that type of activity, according to the police community.

App. 30a–31a. On cross-examination as to his motivation for taking the records, Hepburn stated that he "felt they were loansharking records," and denied that he took them to tie the gun to Scarfo. Hepburn further testified that Scarfo was not arrested or charged with any crime in relation to the papers which were taken. App. 37a. Thus, two factors are asserted as supporting probable cause: Hepburn's experience in recognizing loansharking or gambling records and Scarfo's reputation "in the police community." While both are legitimate considerations in determining probable cause, *cf., Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) (skill and experience of officer relevant in evaluating determination of reasonable suspicion to stop suspect); *Brinegar v. United States*, 338 U.S. 160, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949) (officer's knowledge of prior conviction relevant to probable cause); *United States v. Flynn*, 664 F.2d 1296, 1304 (5th Cir.), *cert. denied*, —— U.S. ——, 102 S.Ct. 1979, 72 L.Ed.2d 446 (1982) (probable cause based on

---

**8.** The government relies on United States v. Phillips, 593 F.2d 553 (4th Cir. 1978), *cert. denied*, 441 U.S. 947, 99 S.Ct. 2169, 60 L.Ed.2d 1050 (1979). Although the fourth circuit in *Phillips* upheld a trial court's decision to admit address books on the basis of plain view, that case does not offer solid support to the government's position. First, the circuit court viewed any error which might have occurred in admitting the evidence as harmless. *Id.* at 557.

Second, the crime under investigation in *Phillips* was conspiracy, and arguably the address book's incriminating or evidentiary nature, in light of the crimes under investigation, was more apparent than here. In addition, the court in *Phillips* offered no explanation as to why the police properly seized the address books, other than to say they were in plain view.

sum of what police know and have heard as officers); *United States v. Ochs,* 595 F.2d at 1247 (police officers had cause to believe in defendant's widespread participation in criminal activity and could therefore seize notebooks), beyond these mere assertions, Hepburn's scant testimony does not present any objective facts which would warrant a finding of probable cause to believe the papers were evidence of loansharking or bookmaking. The investigating officer need not be absolutely certain that he is faced with evidence of crime, *e.g., United States v. Duckett,* 583 F.2d 1309, 1313 (5th Cir. 1978), but he must have had more than a suspicion that seized records in Exhibit 7A were "possibly" evidence of either of two crimes, loansharking or bookmaking. There is no testimony whatsoever which connects Exhibit 7B, the telephone list, with criminal activity. The exhibit is indistinguishable, - except for the names, from the list of names and telephone numbers of members of this court which I have carried in my wallet for over twelve years.

The government relies on *United States v. Ochs,* as support for its position that seizure was proper. In *Ochs,* the court explicitly applied a probable cause standard. There was no dispute that the police had probable cause to arrest Ochs for trafficking in stolen travelers' checks and possessing a gravity knife. 595 F.2d at 1253. The police were entitled to search the car in which Ochs was traveling at the time of his arrest for the stolen checks and weapons, and within the context of that search, they could search containers which they had probable cause to believe contained evidence of the crime. By the time the police had gone that far in their search in *Ochs,* they had probable cause to believe that Ochs was also engaged in conducting a house of prostitution and loansharking. Based on probable cause suggesting the commission of three separate crimes involving records, police were entitled to glance at and seize bankbooks and notebooks. *Id.* at 1258. In this case by contrast, the police did not have probable cause independent of the seized records themselves. There were no other facts which gave the discovered

records any significance beyond what their contents could convey.

The government also argues that the lack of testimony in the record as to why Hepburn believed the records were incriminating is because Scarfo specifically waived a hearing. This contention must be rejected, however, since the plain view doctrine carves out an exception to the warrant requirement on which the government bears the burden of proof. *Chimel v. California,* 395 U.S. 752, 762, 89 S.Ct. 2034, 2039, 23 L.Ed.2d 685 (1969); *Terry v. Ohio,* 392 U.S. 1, 21, 88 S.Ct. 1868, 1879, 20 L.Ed.2d 889 (1968); *Government of Virgin Islands v. Gereau,* 502 F.2d 914, 928 (3d Cir. 1974), *cert. denied,* 420 U.S. 909, 95 S.Ct. 829, 42 L.Ed.2d 839 (1975). The government did not meet its burden of pointing to specific and articulable facts which made it probable that the evidence seized implicated Scarfo in bookmaking or loansharking.

Although a district court's findings of fact on a motion to suppress must be upheld unless they are clearly erroneous, *United States v. Duckett,* 583 F.2d 1309, 1313 (5th Cir. 1978), the district court here made no findings of fact as to probable cause. The court simply asserted, without findings, that the plain view doctrine applied. App. 59a. This court's standard of review is plenary, since the issue is whether the evidence supports the district court's conclusion of law. This court should reverse the district court's decision not to suppress Exhibits 7A and 7B, and grant a new trial.

Scarfo claims that other seized items, including newspaper articles and a bulletproof vest, should have been suppressed. (Appellant's Brief at 31). These items were marked as exhibits by the district court, but they were not offered in evidence by the prosecution. Since the items were not introduced in evidence, failure to suppress them is harmless error. *United States v. House,* 604 F.2d 1135, 1142 (8th Cir. 1979), *cert. denied,* 445 U.S. 931, 100 S.Ct. 1320, 63 L.Ed.2d 764 (1980); *United States v. Mendoza,* 473 F.2d 692, 697 (5th Cir. 1972).

## C. *Inadvertence*

Scarfo also asserts that the plain view doctrine should not apply because the police did not come across the items inadvertently. Since for me the reasons set forth in Part II B require a new trial, I have no reason to discuss this contention. *But see United States v. Crouch,* 648 F.2d at 933; *United States v. Clark,* 531 F.2d at 932.

## III.

Since illegally obtained evidence relevant to the critical issue of Scarfo's possession of the gun was admitted in evidence over objection, and I cannot conscientiously say that it did not contribute to his conviction, I would grant a new trial.