UNITED STATES of America, Appellee,

v.

Richard STRAHAN, Defendant, Appellant.

No. 81–1440.

United States Court of Appeals, First Circuit.

Argued Feb. 10, 1982.

Decided March 23, 1982.

Certiorari Denied June 1, 1982.

See 102 S.Ct. 2304.

Paul P. Hayes, Jr., Quincy, Mass., by appointment of the Court, with whom Hayes & Hayes, Quincy, Mass., was on brief, for defendant, appellant.

Robert B. Collings, Asst. U. S. Atty., Chief, Crim. Div., Boston, Mass., with whom William F. Weld, U. S. Atty., Boston, Mass., was on brief, for appellee.

Before ALDRICH and BREYER, Circuit Judges, and TORRUELLA,* District Judge.

BREYER, Circuit Judge.

Appellant Richard Strahan was convicted of various crimes connected with fraudulent school loan applications. *See* 18 U.S.C. §§ 1014 (false statements to a bank), 1341 (mail fraud) and 1342 (use of a false name in a mail fraud scheme). He attacks his convictions on the ground that the principal evidence against him—documents discovered in an automobile "inventory" search—was improperly obtained. The court below denied Strahan's motion to suppress, holding that Strahan lacked standing to challenge the evidence under *Rakas v. Illinois*, 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978), and that, in any event, the evidence was legally obtained under *South Dakota v. Opperman*, 428 U.S. 364, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976). We affirm Strahan's convictions.

I

On the morning of October 21, 1980, while driving a two-tone brown Volkswagen van borrowed from a man named John Meyers, appellant Strahan was involved in a car accident near the Boston campus of the University of Massachusetts. Strahan apparently left the scene hastily, and a report of a "hit and run" accident, which included a description of the van, went out over the police radio.

Officer Sullivan of the campus police heard the report, spotted the van almost immediately, and managed to stop it on a road near the university. Strahan was the driver and the only occupant. He showed Sullivan his driver's license, but he did not have a vehicle registration for the van. He produced what appeared to be a "title" to

---

* Of the District of Puerto Rico, sitting by designation.

the van in the name of "Meyers," but the back of the "title" document suggested that the van had been sold to someone else. Strahan insisted that Meyers had lent him the van, but was apparently unable to tell Sullivan where Meyers lived or what his phone number was. To make matters worse, during the exchange between Sullivan and Strahan, Sullivan's partner discovered through a radio check that there was a state police warrant out of Monson, Massachusetts, for Strahan's arrest and that Illinois had no record of the number on the van's Illinois license plates.

Sullivan arrested Strahan on the outstanding warrant and took him to the campus police station. At the station, Strahan was informed of his *Miranda* rights and placed in the custody of other officers. Sullivan immediately returned to the van, which had been left with his partner, and proceeded to search it. According to his unchallenged testimony, the search was aimed at inventorying the van's contents before it was towed away to a private garage and at determining who owned the van, which, at that point, the police had good reason to believe was stolen.

When Sullivan reached the van, he found a variety of papers scattered about on the van's floor. Although he noticed among the papers a second Massachusetts driver's license and several checkbooks in Strahan's name, Sullivan did not examine any of the papers closely at this time. Instead, he simply gathered up all the documents, placed them in a plastic bag and brought them to the police station. The van was then towed.

At the station, and still within hours of Strahan's arrest, Sullivan prepared a "preliminary" inventory report of the items discovered in the search. The report consists of a single page of handwritten entries on a standard police form. At about 11:30 that morning, Sullivan gave the documents to Detective Stewart, another campus police officer, who put them into an "evidence locker" without examining the documents himself.

Strahan was booked and charged with three crimes—using a motor vehicle without authority, operating an unregistered and uninsured motor vehicle, and leaving the scene of an accident. After the booking, Sullivan returned to the campus police station. There, at about 3:00 p. m., he examined the documents once again and prepared a considerably more detailed "final" inventory list. Before making this final inventory, Sullivan did not suspect Strahan of any crimes other than those arising out of his use of the impounded van. However, neither did Sullivan know at that point who owned the van. As his testimony makes clear, he hoped by examining the documents to find an answer to that question.

In the course of the more detailed "final" inventory, which resulted in a lengthy handwritten list of documents on several pages of the same standard police form used to prepare the "preliminary" inventory, Sullivan came to suspect the documents implicated Strahan in some sort of misconduct unrelated to the van. Sullivan completed the inventory and once again turned the documents over to Detective Stewart. Stewart then examined the documents himself. He too came to believe the documents implicated Strahan, as in fact they did, in criminally fraudulent conduct.[1]

After having been released on his own recognizance, Strahan returned to the campus police station at about 5:45 in the afternoon. He was accompanied by John Meyers, who claimed to have lent Strahan the van as Strahan had maintained all along. Meyers had a valid Illinois registration for the van, and Detective Stewart therefore

---

1. The documents included two Massachusetts driver's licenses in Strahan's name but with different social security numbers, checkbooks from four different banks, a list of banks in Maine that have loan money available for students, ten college catalogues, a registration certificate at a local community college and a promissory note from a local savings bank in the name of "Steven Whitman," numerous documents addressed to a "J. Stover" spelled at least seven different ways but all to the same address, and newspaper articles about the 1971 graduating class from Newton High School.

released the vehicle to him. Stewart then apparently sought to talk to Strahan about the documents that had been found in the van, but Strahan refused. Strahan asked for the documents back, but Stewart likewise refused.

The next day Stewart spoke to an official in the United States Department of Education. The conversation apparently strengthened his suspicions about the documents, and sometime during the next several days he photocopied all of them. The copies were made available to federal authorities and eventually resulted in appellant's conviction. The originals were returned to appellant on November 3, less than two weeks after they were first seized.

## II

At the outset, it is important to understand precisely what it is about the police conduct in this case that appellant challenges. Strahan concedes that his arrest on October 21 was proper. He also concedes that after his arrest, it was proper to take the van into police custody and to have it towed to a private garage. And, under *South Dakota v. Opperman, supra,* he concedes that at least the initial search and the "preliminary" inventory of the contents of the van were also proper. He does not attack the regularity of the procedures followed in that initial search and does not claim the "inventory" was in any way a pretext used to "conceal[ ] an investigatory police motive." *Id.,* 428 U.S. at 376, 96 S.Ct. at 3100.

What Strahan *does* challenge is everything after the "preliminary" inventory. *Opperman,* in his view, does not support the close and detailed examination (first by Officer Sullivan in preparing his "final" inventory report, and then by Detective Stewart later that same afternoon) of the documents taken from the van. *Opperman* may justify the preliminary search of the van. It may even justify the collection, cataloging and storage for safekeeping of the van's contents while the van was in police custody. But, Strahan argues, *Opperman* does not sanction the detailed scrutiny of papers, checkbooks and documents found in the course of a routine inventory. And, it certainly does not support the retention and photocopying of the documents in the face of a specific demand for their return. Strahan recognizes that, if the police had inadvertently come across evidence of criminal conduct in the course of an otherwise legitimate inventory search, then the "plain view" doctrine would justify the seizure of that evidence, *see Coolidge v. New Hampshire,* 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971). But he argues that the "plain view" doctrine applies only if it is "immediately apparent to the police that they have evidence before them," *id.* at 466, 91 S.Ct. at 2038. He claims that it does not apply where it is not apparent to the police that they have evidence until after an otherwise unjustified exploratory search, or detailed examination of what later turns out to be incriminating evidence. *See 2 LaFave, Search and Seizure* § 7.5(b) at 593–95 (1978).

Strahan's objections to the detailed examination of the papers are grounded in the *Opperman* opinion itself. The historical bases for inventory searches of impounded vehicles as mentioned in the opinion—protection of the owner's property while in police custody, protection of the police against claims or disputes over lost or stolen property, and protection of the police from potential danger, *see South Dakota v. Opperman,* 428 U.S. at 369, 96 S.Ct. at 3097—do not necessarily support detailed examination of documents found in the vehicle. Moreover, at least five of the Justices sitting when *Opperman* was decided expressed specific reservations about detailed examinations of papers found in an "inventory" search. Thus, while joining in the majority opinion, Justice Powell wrote a brief concurrence to emphasize that the decision in *Opperman,* upholding an "inventory [search] of [an] unoccupied automobile ... conducted strictly in accord with [established police] regulations," did not provide a "general license for the police to examine all the contents" of impounded vehicles. *Id.* at 380, 96 S.Ct. at 3102. Justice Powell

recognized that inventory searches might turn up "letters or checkbooks that 'touch upon intimate areas of an individual's personal affairs,' and 'reveal much about a person's activities, associations and beliefs.'" *Id.* at 380 n.7, 96 S.Ct. at 3102 n.7 (quoting *California Bankers Ass'n v. Shultz,* 416 U.S. 21, 78–79, 94 S.Ct. 1494, 1525–1526, 39 L.Ed.2d 812 (1974) (Powell, J., concurring)). And, he noted that in *Opperman* the police apparently did no more than "search for and remove for storage . . . property without examining its contents." *Id.* at 380 n.7, 96 S.Ct. at 3102 n.7. The four dissenters in *Opperman* similarly agreed "that the police would not be justified in sifting through papers secured under the procedure employed here." *Id.* at 388 n.6, 96 S.Ct. at 3106 n.6. *Cf. United States v. Turk,* 526 F.2d 654 (5th Cir.) (improper to play cassette tapes discovered in vehicle "inventory" search), *cert. denied,* 429 U.S. 823, 97 S.Ct. 74, 50 L.Ed.2d 84 (1976). *See generally* 2 LaFave, *Search and Seizure* §§ 7.4(a) at 580–81, 7.5(b) at 595.

▪ On the facts of this case, however, we do not find Strahan's objections persuasive. They overlook the legitimate need of the police to determine who owned the van he was driving. This need arose out of the fact that Strahan was driving the van without a registration, without compulsory insurance, without clear evidence of ownership, and with an independent warrant out for his arrest. As the recitation of facts in Part I of this opinion makes clear, when Officer Sullivan returned to the police station after his preliminary search to examine the seized documents in detail, he still did not know who owned the van. That was what he hoped to discover by examining the documents further. Although it did not significantly address the extent to which searches aimed at determining ownership are permissible, *Opperman* itself suggests that examination of documents for this purpose is proper. *See* 428 U.S. at 369. *See also* 2 LaFave, *Search and Seizure* § 7.4(d) at 584–85. *Cf. id.* § 7.4(a) at 570 n.36. In the circumstances of this case, where documents were examined within hours after they were removed from an impounded and possibly stolen van primarily to determine ownership, we believe the warrantless examination of the documents was not an unreasonable search in violation of the Fourth Amendment. *Compare United States v. McCambridge,* 551 F.2d 865, 870–71 & n.2 (1st Cir. 1977) (given probable cause to believe vehicle stolen, it was reasonable to search the vehicle as well as luggage found therein for clues to the vehicle's true owner).

▪ Since detailed examinations of the documents by Officer Sullivan and Detective Stewart were proper, we find nothing improper in the retention and photocopying of the documents. According to his unchallenged testimony, Sullivan became suspicious of the documents in the course of examining them for the "final" inventory. Stewart, to whom Sullivan turned over the documents after completing the inventory, testified similarly that the documents led him to believe that Strahan was involved in "some sort of fraud" relating to "student help loans and financial aid." In our view, these suspicions satisfied the requirement of *Coolidge v. New Hampshire, supra,* that seizure of an item in "plain view" is justified if it is "immediately apparent to the police that they have evidence" of a crime before them. Strahan argues that neither Sullivan nor Stewart had experience investigating fraudulent student loan cases, and that neither could therefore really have been certain that the documents in question were evidence of such fraud. This argument fails, however, for two reasons. First, as the district judge noted below, "lack of experience should not, and apparently did not, prevent [the police officers] from sensing the obvious." Second, *certainty* is not required. Evidence may be seized under the "plain view" doctrine if, before the seizure, there is "probable cause" to believe the matter seized is in fact evidence of a crime. *See Warden v. Hayden,* 387 U.S. 294, 307, 87 S.Ct. 1642, 1650, 18 L.Ed.2d 782 (1967); *People v. Symmonds,* 18 Ill.App.3d 587, 310 N.E.2d 208 (1974). *See also* 2 LaFave, *Search and Seizure* § 7.5(b) at 594. In view of what the examination of the

documents in this case revealed, there was such "probable cause." *Compare United States v. Sheehan*, 583 F.2d 30, 32 (1st Cir. 1978) (probable cause to secure names and phone numbers on scrap of paper taken from a suspected bank robber's wallet). And, photocopying the documents so that the originals could be returned to Strahan without undue delay did not make an otherwise lawful seizure improper. *See id.*

For these reasons, the denial of appellant's motion to suppress is affirmed.

*Affirmed.*