**UNITED STATES of America, Appellee,**

v.

**Alexander and Albert CRANSTON, Defendants, Appellants.**

**UNITED STATES of America, Appellee,**

v.

**Bernard CRANSTON, Defendant, Appellant.**

**Nos. 81–1481, 81–1482.**

United States Court of Appeals, First Circuit.

Submitted May 7, 1982.

Decided Aug. 13, 1982.

---

Willie J. Davis, Boston, Mass., on brief for appellants in 81–1481.

Owen S. Walker, Federal Defender Office, Boston, Mass., on brief for appellant in 81–1482.

William F. Weld, U. S. Atty., and Kevin J. O'Dea, Sp. Asst. U. S. Atty., Boston, Mass., on brief for appellee.

Before COFFIN, Chief Judge, BOWNES and BREYER, Circuit Judges.

BOWNES, Circuit Judge.

Appellants Alexander "Scott" Cranston (Scott), Albert "Joko" Cranston (Joko), and Bernard Cranston (Bernard) were charged, along with Murdock Cranston, in a 10 count indictment with conspiracy to import swordfish into the United States contrary to law, 18 U.S.C. §§ 371, 545 (count 1), and with nine acts of causing the illegal importation of swordfish (counts 2–10). The ille- gal importations were alleged to have taken place in August and September 1979, and in October 1980. Scott and Joko were found guilty on all counts, and Bernard on the conspiracy count and two of the substantive counts. Murdock, according to the government's brief, failed to appear for trial and is a fugitive.

Basically, the evidence showed that during the time frame embraced by the indictments, various captains, at the behest of one or another of the appellants, picked up swordfish either from a vessel hovering off Canadian shores or at a Canadian port and brought the fish to Gloucester, Massachusetts. The captains, who alone had the duty, all parties agree, to report to the United States customs (see, e.g., 19 U.S.C. §§ 1431(a), 1433, 1434) failed to do so, and the swordfish were illegally unloaded without being declared. See, e.g., 19 U.S.C. §§ 1448, 1461. Scott and Joko contend that no properly admitted evidence indicated they counseled, commanded, induced, or otherwise procured the captains not to report to customs or knew that the captains would be committing an illegal act by failing to report; therefore, they maintain, there was insufficient evidence to support their convictions for illegal importation or conspiracy to import illegally. They also argue that the trial court failed to follow the standards enunciated in *United States v. Petrozziello*, 548 F.2d 20 (1st Cir. 1973), and *United States v. Ciampaglia*, 628 F.2d 632 (1st Cir.), *cert. denied*, 449 U.S. 956, 1038, 101 S.Ct. 365, 618, 66 L.Ed.2d 221, 501 (1980), governing the admission of co-conspirators' statements and that consequently one of Murdock's statements directing a captain not to report to customs was improperly admitted. Bernard, while believing there was sufficient evidence Scott and Joko acted together, contends there was insufficient evidence he entered an agreement with them or knew that their plan included illegal—as opposed to legal—importation. He also challenges the court's instruction on reasonable doubt.

A. *Petrozziello Ruling*

■ We start with Scott's and Joko's second argument. In *United States v. Pe-*

*trozziello*, 548 F.2d 20 (1st Cir. 1973), we stated that a district court may admit an out of court declaration of a co-conspirator under Fed.R.Evid. 801(d)(2)(E) provided "it is more likely than not that the declarant and the defendant were members of a conspiracy when the hearsay statement was made, and that the statement was in furtherance of the conspiracy," *id.*, 23, and in *United States v. Ciampaglia*, 628 F.2d 632 (1st Cir. 1980), we added that *Petrozziello* rulings are to be made at the conclusion of all the evidence, *id.*, 638. We adopted the following rule:

> If the prosecution attempts to introduce into evidence an out-of-court declaration under Fed.R.Evid. 801(d)(2)(E), the trial court, upon proper objection, may conditionally admit the declaration. If the declaration is conditionally admitted, the court should inform the parties on the record out of the hearing of the jury that (a) the prosecution will be required to prove by a preponderance of the evidence that a conspiracy existed, that the declarant and defendant were members of it at the time that the declaration was made, and that the declaration was in furtherance of the conspiracy, (b) that at the close of all the evidence the court will make a final *Petrozziello* determination for the record, out of the hearing of the jury; and, (c) that if the determination is against admitting the declaration, the court will give a cautionary instruction to the jury, or, upon an appropriate motion, declare a mistrial if the instruction will not suffice to cure any prejudice.

*United States v. Ciampaglia, supra*, 628 F.2d at 638. As Scott and Joko now point out, the *Petrozziello* ruling was made on the second day of evidence rather than at the close of the evidence and the court, in shortened form, merely ruled there was sufficient evidence of a conspiracy among the defendants and Murdock to bring in swordfish and made no specific finding that the objected to conversation was in furtherance of the conspiracy. At trial, however, Scott and Joko made no objection directed either to the timing or content of the *Petrozziello* ruling; rather they, then as now, suggested the evidence at the time of the ruling was insufficient to support a finding of conspiracy. Because final *Petrozziello* rulings are supposed to be made at the close of the evidence and as alleged co-conspirators' statements may be admitted conditionally before then, we need not decide whether there was sufficient evidence of a conspiracy among the Cranstons to import swordfish illegally into the United States at the time Murdock's complained of statement was admitted into evidence. For reasons to be discussed, we conclude there was, at the close of the evidence, sufficient evidence of such a conspiracy, including substantial independent, non-hearsay evidence, and consequently we conclude that Murdock's statement was admissible under a proper application of the *Petrozziello* standard and that the deviations therefrom were not plain error. *United States v. David E. Thompson, Inc.*, 621 F.2d 1147, 1153 (1st Cir. 1980); *United States v. Pappas*, 611 F.2d 399, 405 (1st Cir. 1979).

B. *Sufficiency of the Evidence*

■ We turn then to the evidence. Five captains testified concerning the various swordfish trips they had made to Canada. Additional evidence was provided by boat owners, deck hands, and customs agents. Viewed most favorably to the government, *United States v. Cordero*, 668 F.2d 32, 35 (1st Cir. 1981), the evidence included the following.

Donald Cameron, captain of the MRS. MARIA, testified that in August 1979 both Scott and Joko asked Cameron if he would like to make a couple of trips to Nova Scotia, Canada, pick up swordfish, and bring it back to the United States. Cameron agreed, and Scott and Joko said they would inform him when they had something set up. A week or so later, Scott and Joko gave Cameron the bearings of the pick up point and told him which boat to contact in Canada and which radio channel to use. Before departing, Cameron asked them what to do if caught by customs, and either Scott or Joko (Cameron did not remember which as they were always together) re-

plied, in the presence of the other, that Cameron should say he caught the swordfish but had lost his fishing gear on the last set. Cameron thereafter sailed to Canada, picked up the swordfish, and returned to Gloucester, radioing Scott and Joko before entering the harbor. Scott and Joko met Cameron at a specified dock, and the swordfish were unloaded onto waiting U-haul trucks. Cameron did not report to United States customs. Cameron thereafter made two more trips at Scott's and Joko's direction, both times failing to report to United States customs. Several hours after his return from the third trip and while the swordfish were being unloaded by Scott, Joko, Bernard and others, Cameron was questioned about the fish by a customs agent. As prearranged, Cameron replied he had caught the fish, but as some of the fish already had weights stamped on them, his story was not convincing and Cameron was arrested.

Cameron's testimony alone was sufficient to establish that Scott and Joko conspired with each other to import swordfish into the United States contrary to law. From their advice to Cameron to lie to customs if caught, it can be inferred that they knew a captain of a United States vessel returning from a foreign place had a duty to report to United States customs and that they counseled against reporting. While Cameron's testimony, as recited so far, provided sufficient evidence to sustain Scott's and Joko's conviction on the conspiracy count and on three of the substantive illegal importation counts, Murdock's and Bernard's membership in the conspiracy, as well as six substantive counts, remain. We therefore continue with the evidence.

After Cameron was released from custody, he met with Scott and Joko. They wanted Cameron to talk with Murdock Cranston, who was in Canada, so they took Cameron to a pay phone in a department store basement. Murdock was on the line and said, "Just be cool and keep things quiet and things would be taken care of." Thereafter, Joko asked Cameron not to involve him because he (Joko) had a family and was not really part of things.

Elizabeth Akerley, captain of the PATROL, testified that Scott approached her in August 1979 and asked if she would like to pick up swordfish in Canada and transport them to Gloucester. She agreed, and Scott provided her with pertinent information for contacting and meeting, off the shore of a small Canadian island, a vessel from which to offload the swordfish. Scott gave her Murdock's telephone number in Canada and told her to notify Murdock "[i]n case something should go wrong." Akerley transported the fish to Gloucester, but intentionally neglected to report to customs. Scott and Joko met her at a dock, and the fish were loaded onto U-hauls. After the fish were weighed in Boston, Scott paid Akerley the agreed upon price.

Joseph Randazza, captain of the PEPPY, testified that in August 1979 he approached Bernard Cranston and asked if he (Randazza) could make a swordfish trip. Bernard responded that someone would contact him. Thereafter, Randazza received a phone call from a person he could not identify (but who was not Scott, Joko, or Bernard as Randazza would have recognized their voices) and as a result of that call, Randazza met with Murdock on a wharf in Gloucester. There, Murdock gave him the location of the swordfish to be picked up in Canada. At some point, Murdock, Randazza believed, told him not to report to customs. With Bernard a crew member, Randazza made the trip, returning to Rose's wharf in Gloucester as instructed by the phone caller. There, he was met by Scott and, he thought, Joko, and the fish were unloaded onto U-hauls. Randazza did not report to customs. Later, Scott paid him for transporting the fish.

On four subsequent occasions, Randazza was contacted by the same unidentified caller with information concerning swordfish trips. He made the four trips to Canada, three of the times with Bernard as a crew member. On each of those three occasions, Randazza did not report to customs, Scott met Randazza on his return, the fish were unloaded onto U-haul trucks, and

Scott paid Randazza for transporting the fish. On the one occasion Bernard was not a crew member, Randazza was apprehended in Canada by Canadian customs while transferring fish from one boat to the other. Randazza was arrested and the swordfish—except for those hidden under ice in the fishhold—were seized. Upon his return to Gloucester, Randazza was not met by Scott, and Scott declined to purchase the fish. At some point before the last trip, Randazza had a conversation with, he believed, Scott, who said that if Randazza were approached by American customs, Randazza should say he had caught the fish.[1] When Randazza was subpoened by the grand jury, Scott told him not to say anything.

Randazza indicated the normal procedure employed when returning to the United States with foreign merchandise is to report to customs, have customs inspect the load, and then unload the vessel.

Richard Tucker, captain of the TEMPEST, testified that in October 1980 Bernard, who had been a member of Tucker's crew, asked if Tucker would be interested in a swordfish trip to Canada. Tucker agreed, and Bernard returned the following day with the relevant information. Tucker was to be paid 40 cents per pound of swordfish. Bernard directed Tucker to go to Seal Island in Canada where a boat would call him. Bernard declined to accompany Tucker, stating he had to stay ashore to make arrangements on the Gloucester end. Tucker made the trip and laid off the island a few hours until contacted by a vessel. Then, as directed by the vessel, he went to the back of the island, met the vessel, and transferred fish all night, taking on 40,000 pounds. When Tucker returned to Gloucester, Bernard was waiting on the wharf. Tucker did not report to customs, and the fish were unloaded onto U-haul trucks. Before the unloading was completed, but after approximately half of the swordfish had been driven away, Bernard

---

1. The testimony on direct examination by the government was as follows:

Q Now, sir, I will ask you whether you had a conversation with anyone concerning what you were to do if you were picked up by the authorities?
    MR. DAVIS: Objection.
    THE COURT: Yes or no. Did you?
    THE WITNESS: Yes.
    THE COURT: Go ahead.
Q With whom did you have the conversation?
A I believe it was Scott.
Q And what did Scott tell you?
A That "If you should get approached by American Customs, to say that you had caught the fish yourself."
It is true that on cross-examination Randazza deviated somewhat from his direct testimony:
Q Now you say you did have a conversation at some point with somebody, where somebody said to you that if you get stopped by customs or the Coast Guard, you are to say that you caught the fish in American waters?
A Yes, sir.
Q Do you remember when that person told you that, whoever it was?
A No, sir.
Q Would that have been before the first trip?
A It could have been.
Q Could have been?
A Could have been.
Q Could have been after the last trip?

A No. I don't think it was after the last trip.
Q Now do you of your own knowledge know who that person was?
A Honestly, no.
Q You do not know, do you?
A No, sir.
Q You cannot be sure who it was?
A No, sir.
Q You cannot say with an degree of certainty that it was Scott Cranston who said that, can you?
A No, sir.
Q But yet when you were asked on direct examination, you said you believed it was Scott.
A Yes, sir.
Q That is all? You don't know, though?
A No, sir.
Randazza testified he knew Scott and could recognize his voice. That Randazza believed the conversation was with Scott but could not say so with certainty did not render his testimony on the point incompetent. Resolution of any inconsistency was for the jury. See *Dirring v. United States*, 328 F.2d 512, 514 (1st Cir.), *cert. denied*, 377 U.S. 1003, 84 S.Ct. 1939, 12 L.Ed.2d 1052 (1964) (where witness's cross-examination testimony contradicts his direct testimony, ordinarily the jury may decide which to accept as the truth); *Zimberg v. United States*, 142 F.2d 132, 136 (1st Cir.), *cert. denied*, 323 U.S. 712, 65 S.Ct. 38, 89 L.Ed. 573 (1944) (same).

disappeared and a customs inspector appeared who, around 1:00 a. m., arrested Tucker. The TEMPEST and remaining swordfish were seized. Later, Tucker asked Bernard for money for attorney fees, and Bernard said he'd see what he could do. The next day, Bernard said he was still working on the matter. Subsequently, pursuant to the discussions they had had about money for attorneys fees, Bernard did pay Tucker $13,500. This amount was less than the $16,000 total (40 cents per pound $\times$ 40,000 pounds) Tucker originally had expected. Tucker testified it represented payment for transporting that portion of the swordfish which had escaped seizure and had been sold. A few days after the seizure, Bernard asked Tucker to keep his name out of things.

George Cressey, captain of the TONY AND NINA, testified that in October 1980 he made a swordfish trip to Canada at Scott's direction. Murdock came aboard while Cressey was in Canada. Cressey did not intend to report to customs, and upon return he waited outside Gloucester for dark to come. He contacted Scott by radio and was directed to proceed to Rocky Neck. There, they discussed the seizure of the TEMPEST the day before and waited for customs officials, who soon arrived. The fish were tested and returned to Canada. Cressey was never paid for the trip.

The recited evidence reflects cooperative and coordinated efforts by Scott, Joko, Bernard, and Murdock to carry out the swordfish importation business. Scott, Joko, and Bernard all, at one time or another, procured captains to make the runs; Bernard, it could be inferred, put Randazza in contact (via the unidentified caller) with Murdock through whom a swordfish trip was arranged [2] and on a latter occasion arranged a trip himself; Murdock was the person to contact in case anything went wrong; Scott, Joko and Bernard would await the vessels' return to Gloucester and oversee or participate in the unloading. That Scott, Joko, and Murdock understood illegal importation was part of the plan was shown from their directions to various of the captains to evade customs either by failing to report or by lying if caught, and Scott and Joko's consciousness of the illegality can be inferred from their individual efforts to cover up their participation— Scott asked Randazza not to say anything to the grand jury and Joko requested Cameron not to implicate him. The trips underlying the substantive counts all appear to have been part of the general scheme. Consequently, we have no difficulty in concluding that Murdock's complained of statement was properly admitted under Fed.R. Evid. 801(d)(2)(E) against Scott and Joko and that there was sufficient evidence to sustain Scott's and Joko's convictions on the conspiracy count and the first eight substantive counts. The ninth substantive count (Count 10) involves a trip by Tucker which was apparently arranged by Bernard without the direct participation of Scott or Joko. As demonstrated below, the evidence is sufficient to convict Bernard for arranging this trip. Scott and Joko, as co-conspirators, are responsible for his acts. *Pinkerton v. United States*, 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946).

As for Bernard, his failure, upon Randazza's request for a swordfish trip, to refer Randazza directly to one of the Cranstons and his adoption instead of the circumspect method of having an unidentified caller contact Randazza suggests an effort initially to conceal the principals' identities (until, perhaps, the captain's reliability was established to the unidentified caller's satisfaction) and does not bode well for Bernard's claim he believed the family fish business to be entirely legitimate. Further,

---

**2.** Bernard contends there was no evidence the phone call which Randazza received from the unidentified caller and which ultimately led to a meeting with Murdock at which a swordfish trip was arranged was the result of Randazza's earlier conversation with Bernard seeking a swordfish trip to Canada. Bernard had told Randazza someone would get in touch with him (Randazza), and Randazza thought he had given Bernard his phone number. It is reasonable to infer from the timing of the call and from its subject matter—swordfish to be picked up in Canada—that the call was the contact Bernard had said would follow.

Bernard was a crew member on four of Randazza's swordfish trips and was in a position to see that the normal reporting procedure described by Randazza—a report to customs and customs inspection prior to unloading—was not followed either on those four occasions or on Tucker's return from his trip. Yet Bernard furthered the enterprise by participating in (as one of Randazza's crew) or overseeing (on Tucker's return) the offloading, knowing, it can be inferred, no report or inspection had taken place. His effort to conceal his involvement—his request that Tucker keep his name out of things—was indicative of consciousness of guilt, and his response to Tucker's request for attorney's fees—that he'd see what he could do—did not betoken one who considered himself uninvolved in or innocent of the requester's failure to clear customs. That Bernard paid Tucker for transporting only that portion of the fish which escaped customs, rather than for the whole load, suggests customs avoidance was an implicit requirement of the arrangement. Thus, we conclude there was sufficient evidence Bernard was a member of the charged conspiracy. While a member, he was responsible for his own acts and those of his co-conspirators in furtherance of the conspiracy. *Pinkerton v. United States*, 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946). Consequently, there was sufficient evidence to support all of Bernard's convictions.[3]

### C. *Reasonable Doubt Instruction*

■ Next, Bernard argues the italicized portion of the court's instruction on reasonable doubt constituted reversible error:

"A reasonable doubt is a doubt based upon reason and common sense, the kind of doubt that would make a reasonable person hesitate to act. Proof beyond a reasonable doubt must, therefore, be *proof of such a convincing character that you would be willing to rely and act upon it in the most important of your own affairs.*"

"A reasonable doubt exists whenever, after careful and impartial consideration of the evidence in the case, a juror does not feel convinced with certainty that a defendant is guilty of the charge."

Defendant did not object to the charge, and thus we would reverse only on a showing of plain error.

As Bernard points out, we have criticized the italicized language on two grounds: the use of the "willing to act" formulation—as opposed to the preferred, "hesitate to act" phraseology—and the implicit comparison of a juror's deliberative process with that employed in every day decision making, a comparison which has the potential for impermissibly reducing the government's burden of proof. *United States v. Del Toro Soto*, 676 F.2d 13, 17–18 (1st Cir. 1982); *United States v. Drake*, 673 F.2d 15, 20 (1st Cir. 1982); *United States v. Gordon*, 634 F.2d 639, 644 (1st Cir. 1980); *Dunn v. Perrin*, 570 F.2d 21, 24 (1st Cir.), *cert. denied*, 437 U.S. 910, 98 S.Ct. 3102, 57 L.Ed.2d 1141 (1978). However, as in *Del Toro Soto* and *Gordon*, viewing the charge in context, we conclude there was no plain error.

*Affirmed.*

---

**3.** Bernard also argues that as there was no evidence of the first three and fourteenth overt acts alleged in the indictment, they should have been stricken from the indictment shown to the jury. During a bench conference, the court acknowledged that "[s]ome of the overt acts are out" and agreed that said parts could not be shown in the copy sent to the jury. The copy of the indictment contained in Bernard's record on appeal (though not the one contained in Scott's and Joko's record) omits overt acts 1, 2, 3 and 14. Bernard has not shown that an unsanitized copy was sent to the jury. Next,

Bernard complains that while the court told the jury that commission of an overt act in furtherance of the conspiracy was an element of conspiracy, the court neglected to specify that the overt act must be one charged in the indictment. This objection was not made at trial. Among the 18 overt acts enumerated in the indictment were the various illegal importations. By finding the defendants guilty on the substantive counts, the jury concluded said acts had occurred. Thus, under the circumstances, error, if any, was harmless.