| Dist. No. | Total Pop. | White Pop. | Black Pop. | Black Pct. | Hispanic Pop. | Hispanic Pct. | AS&PI Pop. | AS&PI Pct. |
|---|---|---|---|---|---|---|---|---|
| 6 | 62872 | 52427 | 4601 | 7.32 | 6673 | 10.61 | 835 | 1.33 |
| 7 | 61629 | 12074 | 40902 | 66.37 | 8826 | 14.32 | 457 | 0.74 |
| 8 | 61904 | 51400 | 5801 | 9.37 | 4133 | 6.68 | 1801 | 2.91 |
| 9 | 65264 | 57245 | 2673 | 4.10 | 2911 | 4.46 | 3784 | 5.80 |
| Total | 562994 | 393937 | 126229 | 22.42 | 36068 | 6.41 | 15150 | 2.69 |

NOTE: Some individuals are counted in more than one group; accordingly, the sum of the group totals is somewhat larger than the actual populations in each district.

UNITED STATES of America, Appellee,

v.

Ralph JOHNSTON,
Defendant, Appellant.

UNITED STATES of America, Appellee,

v.

Michael ANDREWS,
Defendant, Appellant.

UNITED STATES of America, Appellee,

v.

Edward RIST, Defendant, Appellant.

Nos. 85–1268, 85–1269 and 85–1281.

United States Court of Appeals,
First Circuit.

Argued Nov. 14, 1985.

Decided Feb. 20, 1986.

Richard M. Egbert, Boston, Mass., with whom Edward J. Romano, Providence, R.I., were on brief, for defendant, appellant Ralph Johnston.

James R. Rosencranz, Boston, Mass., was on brief, for defendant, appellant Michael Andrews.

Francis J. DiMento, and DiMento & Sullivan, Boston, Mass., were on brief, for defendant, appellant Edward Rist.

E. Sydney Hanlon, Asst. U.S. Atty., and William F. Weld, U.S. Atty., Boston, Mass., were on brief, for appellee.

Before COFFIN and BREYER, Circuit Judges, WYZANSKI,* Senior District Judge.

COFFIN, Circuit Judge.

Appellants Ralph Johnston, Michael Andrews, and Edward Rist appeal from jury convictions on narcotics charges. They raise numerous claims challenging the legality of their convictions. We reject these claims, and affirm the judgment of the district court.

The facts as presented at trial showed that the three appellants and others conspired during Memorial Day weekend in 1982 to bring a multi-ton load of marijuana into the Fairhaven, Massachusetts harbor. Robin Dodge, an unindicted co-conspirator, was the government's primary witness at trial. His testimony was substantially corroborated by his wife's testimony, post-arrest statements by Rist, and other government evidence, including telephone records, hotel records, and physical evidence seized from Johnston.

In May, 1982, Dodge was approached by Richard Curry, whose friends had a boat filled with marijuana but did not have an off-load site. Dodge arranged to provide a site, and enlisted Andrews to help him.

* Of the District of Massachusetts, sitting by designation.

Dodge and his wife, Ellen, met with Andrews and codefendant-fugitive Welch, who both agreed to work with Dodge on the off-load.

Andrews, Welch, and Dodge met with Curry's friend, Johnston, who was a partial owner of the marijuana. In exchange for payment, Dodge agreed to provide Johnston with security and assistance for the off-load. Johnston, Dodge, and others rented hotel rooms near Fairhaven, and spent the night before the off-load in the hotel, discussing finances and using drugs. The next day, Dodge, Johnston, and Welch went to the dock to await the boat, while Andrews and another man communicated with the boat by radio.

When the boat arrived, Dodge unloaded the first thousand pounds of marijuana into his van. Dodge and Johnston then began offloading more of the shipment into the first of two tractor trailers. Rist, a co-owner of the shipment, was also unloading at the dock and remained there until the trucks left. Johnston and Dodge walked around the dock to ensure that no strangers were present.

Dodge returned to the hotel, met Ellen Dodge and Andrews, and drove with them to the Dodges' residence. Several days later, Dodge telephoned Johnston, and then Rist, demanding the remainder of his payment. Johnston met Dodge and paid him partially. Dodge collected the remaining money from the sale of the first thousand pounds, which were in his possession. After learning of events that put him in danger of criminal charges and physical harm, Dodge offered to cooperate with the government in the prosecution stemming from this off-load.

In August, 1984, a federal grand jury returned a four-count indictment against Rist, Johnston, Andrews, and Welch. They were charged with the following offenses: possession with intent to distribute more than 1,000 pounds of marijuana in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(6); conspiracy to do the same in violation of 21 U.S.C. § 846; importation of marijuana in violation of 21 U.S.C. § 952(a); and conspir-

acy to do the same in violation of 21 U.S.C. 963. Johnston, Rist, and Andrews were arrested and arraigned. Welch was and remains a fugitive.

The district court held hearings on many pretrial motions, including a motion to suppress physical evidence. The court allowed in part and denied in part Johnston's motion to suppress. The trial lasted eight days, and at the close of evidence the court entered judgment of acquittal for all appellants on the importation counts. The jury returned a verdict finding Johnston guilty on both remaining counts, and Andrews and Rist guilty of conspiracy to possess, but not guilty of possession.

We address each of appellants' claims below.

### 1. *Johnston's Motion to Suppress*

Johnston argues that the district court erred by not fully granting his motion to suppress certain evidence. The district court found that the search in question was lawful, but that in several respects it exceeded the scope of the warrant and the plain view doctrine. Accordingly, the court granted Johnston's motion to suppress some evidence, but denied his motion as to other evidence.

Before discussing the propriety of the district court's ruling, we will review the circumstances of the search. Pursuant to a valid search warrant, Detective Hyde, Sergeant Yoo, and officers Canney and Kurisko searched the house of Johnston's mother-in-law. The warrant authorized a search for "[c]ontraband consisting of marijuana, marijuana deratives [sic], and any other substance classified under Chapter 94C of the Massachusetts Drug Laws." During the search, Hyde retained full authority to determine what items would be seized.

The police first searched the dining room, where they observed a pipe with residue that smelled like marijuana, a cannister containing marijuana, and a spiral-bound notebook that was closed when first seen. Only a printed seal and the name of a local

university appeared on the outside cover of the notebook. Yoo opened and scanned the notebook.

Kurisko discovered two plastic bags containing marijuana in a teapot in the dining room. In a sugar bowl, she found adding machine tapes. On the dining room floor, Kurisko and Yoo observed sheets of paper torn from a spiral notebook. They examined the loose pages and saw that the top sheet contained two columns of figures. Yoo showed the loose pages to Hyde, who suspected their evidentiary value but did not at that point draw any firm conclusions.

The search extended to the downstairs level of the house. The police found $20,-000 in a liquor box; in a briefcase, they found some cocaine and marijuana. Elsewhere on the lower level, they found various amounts of marijuana, other drugs, and drug paraphernalia. In a downstairs bedroom closet, the police found a large wooden chest, which held several cannisters that contained differing amounts of marijuana, other drug-related items, and a single sheet of ledger paper. The sheet of paper was folded and had no writing on the outside. Yoo unfolded the sheet and discovered notations similar to those on the loose pages found on the dining room floor.

The warrant, by its terms, did not support the seizure of the notebook, the adding machine tapes, the loose pages found on the dining room floor, the $20,000, or the single sheet of folded ledger paper. The district court found that some of these items were seized lawfully pursuant to the

"plain view" doctrine, an exception to the warrant requirement of the Fourth Amendment. *See Coolidge v. New Hampshire,* 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971) (plurality opinion). The plurality opinion in *Coolidge* created a three-step requirement for the admission of plain view evidence: that the seizing officer have a prior justification for being in a position to see the item in plain view, that the discovery of the item be inadvertent, and that the evidentiary value of the item be "immediately apparent" to the officer.

The district court determined that the officers' search of the house was valid and their discovery of evidence found by looking into closed containers that might contain marijuana was inadvertent. Thus, when the officers opened the sugar bowl, the liquor box, and the wooden chest, they were justified in viewing the adding machine tapes, the cash, and the folded sheet of ledger paper. Similarly, the loose pages on the dining room floor and the closed notebook on the dining room table were in plain view. Johnston does not contest these findings.

The court next examined whether the evidentiary value of each item was immediately apparent to the officers.[1] The court suppressed the spiral notebook and the folded sheet of ledger paper. The writing on these items' covers, which were in plain view, was minimal or nonexistent, and could not have raised any suspicion about the items.[2] The incriminating nature of the items was not "immediately apparent"

1. The purpose of the "immediately apparent" requirement was articulated by Justice Stewart, the author of the plurality opinion in *Coolidge:*
   "Of course, the extension of the original justification is legitimate only where it is immediately apparent to the police that they have evidence before them; the 'plain view' doctrine may not be used to extend a general exploratory search from one object to another until something incriminating at last emerges." 403 U.S. 443, 466, 91 S.Ct. 2022, 2038, 29 L.Ed.2d 564 (1971).
   Thus, to assure that warranted searches do not result in "exploratory rummaging", the plain view doctrine limits the right of seizure to items

whose incriminating nature is immediately apparent to the searching officers. *See United States v. Wright,* 667 F.2d 793, 797 (9th Cir. 1982).

2. The court properly reasoned that the opening of the notebook and the unfolding of the paper did not constitute additional searches justified by the warrant because they were not containers likely to contain marijuana. Although the officers were justified in inspecting any closed containers to determine if they contained marijuana, this examination did not call for the perusal of the notebook's written content or the unfolding of the ledger paper.

to the officers but was revealed only after an examination of their contents.[3]

In contrast, the district court found that the writing on the loose pages and on the adding machine tapes was open to plain view and was therefore subject to the officers brief perusal. The court then considered whether the exposure of these items gave the police, considering their experience, probable cause to believe they were viewing evidence of illegal conduct. *See Texas v. Brown*, 460 U.S. 730, 742, 103 S.Ct. 1535, 1543, 75 L.Ed.2d 502 (1983). *See also United States v. Strahan*, 674 F.2d 96, 100 (1st Cir.1982) (seizure supported by plain view doctrine if before seizure "there is 'probable cause' to believe the matter seized is evidence of a crime"). The court determined that Detective Hyde had probable cause to believe that the loose pages, the adding machine tapes, and the $20,000 constituted evidence, and thus he seized them legally.

Johnston claims that the admission into evidence of the loose pages and the adding machine tapes constituted grievous error. He argues that whether the evidentiary value of the items was immediately apparent to the officers should be examined from the perspectives of Officer Kurisko and Sergeant Yoo, because they first discovered the evidence. Johnston also notes that if we choose to make the inquiry from the perspective of Detective Hyde, we should do so only when he first viewed the items. We disagree.

■ Johnston offers no support for placing such artificial limitations on the plain view doctrine. The executing officers are not limited by the fortuity of which officer first happened upon the evidence. They may be limited by the shared knowledge and experience of the officers otherwise lawfully on the premises, but in this case Kurisko, Yoo, and Hyde were all executing officers. The plain view doctrine would apply if either Kurisko, Yoo, or Hyde had probable cause to believe the items were

evidence of a crime. We must examine, "[f]rom the 'facts available' to the executing officers in the case before us", whether they could determine if they had discovered evidence of a criminal nature. *See United States v. Szymkowiak*, 727 F.2d 95, 98 (6th Cir.1984).

In *Szymkowiak*, pursuant to a valid search warrant for specified items of jewelry and a television set, the executing officers inadvertently found two weapons. To determine whether possession of these guns was illegal, the officers called the Bureau of Alcohol, Tobacco and Firearms and asked for an agent to come to the site of the search to examine the weapons. The Sixth Circuit suppressed the guns, finding that the executing officers "could not determine whether they had discovered evidence of a criminal nature." *Id.* at 99. The court stated that "[t]he officers very decision to call" for assistance indicates that they did not, from the "facts available to them" "at the time", have probable cause to believe the firearms were incriminating. *Id.* Here, the executing officers did have the knowledge, based on facts *available to them at the time of the search,* of these items' criminal nature.

■ Johnston would also have us limit our inquiry to Hyde's belief when he first viewed the items. Although the police are not allowed to scrutinize the items closely to ascertain their incriminating nature, *see, e.g., United States v. Issacs*, 708 F.2d 1365, 1370 (9th Cir.1983), they are not limited by the chance of which room they happen to search first. In this case, had Hyde searched the downstairs bedroom first, when he subsequently viewed the papers upstairs he would have had probable cause to believe they were evidence of a crime. A plausible limitation would require Hyde to form probable cause during this search in this house, but the more specific limitation urged by Johnston does not seem prudent. *See State v. Williams*, 299 N.C. 529, 263 S.E.2d 571, 573 (1980).

---

**3.** *See United States v. Wright*, 667 F.2d 793 (9th Cir.1982); *State v. Shinault*, 120 Ariz. 213, 584

P.2d 1204 (Ariz App.1978).

We will examine the items' evidentiary value from the perspective of Detective Hyde, because he was the officer who made the determinations of which items to seize. Detective Hyde had extensive experience and training concerning drug trafficking.[4] At the time of the search, Hyde had been a police officer for eight years, at least two of them as a detective in a narcotics unit. In addition to receiving basic police training, he had attended numerous seminars and a training course given by the Drug Enforcement Administration. For approximately seven months, he worked with a federal and state task force investigating drug smuggling.

Thus, even when he first saw the adding machine tapes, and the loose pages in proximity to the marijuana, he suspected these items' evidentiary value, based on training he had received that alerted him to suspect papers discovered during a drug-related arrest. After searching the lower level of the house, Hyde's suspicions of the loose pages discovered upstairs increased. In his experience, marijuana possessed only for personal use was kept in a single "stash". The separation of the marijuana in the chest suggested to him that the containers held samples from different bales. The suggestion of marijuana trafficking, the presence of a large amount of cash, and the proximity of the pages to the marijuana led Hyde to conclude that the pages and the adding machine tapes contained records of drug transactions.

Johnston also argues that this evidence should be suppressed, because, even if it was seized legally, it was seized as a result of an illegal search. Johnston claims that it is as a result of Hyde's having seen the illegally seized documents, the contents of the notebook and the single folded sheet of ledger paper, that he had probable cause to suspect the other evidence. The district court found, however, that Hyde's suspicion was raised to probable cause when he observed evidence *legally seized*, that is, the additional marijuana, the cash, and the pages that were in proximity to the marijuana. A review of the record in this case supports the district court's finding. For example, Detective Hyde testified that the way the marijuana was "separated and individualized is what aroused [his] suspicion". From that fact, the "sum of money", and the proximity of the papers to the marijuana, Hyde concluded that the samples could have been from some "smuggling" operation.

## 2. *Co-conspirator Exception to the Hearsay Rule*

Appellants argue that the district court improperly admitted certain testimony pursuant to the co-conspirator exception to the hearsay rule. Fed.R.Evid. 801(d)(2)(E). That rule provides that "a statement by a coconspirator of a party during the course and in furtherance of the conspiracy" is "not hearsay", and is therefore admissible. In *United States v. Petrozziello*, 548 F.2d 20 (1st Cir.1977), we stated that "if it is more likely than not that the declarant and the defendant were members of a conspiracy when the hearsay statement was made, and that the statement was in furtherance of the conspiracy, the hearsay is admissible." *Id.* at 23. Appellants claim that out-of-court statements by Dodge, his wife Ellen, Johnston, and Cynthia Silva [5] should not have been admitted because the government did not establish the existence

---

4. The Supreme Court has stated that "a law enforcement officer may rely on his training and experience to draw inferences and make deductions that might well elude an untrained person." *Texas v. Brown*, 460 U.S. 730, 746, 103 S.Ct. 1535, 1545, 75 L.Ed.2d 502 (1983) (Powell, J., concurring) (citing *United States v. Cortez*, 449 U.S. 411, 418, 101 S.Ct. 690, 695, 66 L.Ed.2d 621 (1981)).

5. Andrews also argues that Silva's out-of-court statements were inadmissible because the government failed to prove that Silva was unavailable, thus violating his Sixth Amendment confrontation right. Andrews waived this argument by not raising it below. Moreover, this court has repeatedly rejected confrontation clause challenges to the admission of co-conspirator statements under Rule 801(d)(2)(E). *See e.g., United States v. Dunn*, 758 F.2d 30, 39 (1st Cir.1985).

of a conspiracy by a preponderance of the evidence.

Following a procedure we recommended in *United States v. Ciampaglia,* 628 F.2d 632 (1st Cir.1980), the district court conditionally admitted the out-of-court declarations of co-conspirators during trial, subject to a final determination as to the admissibility of the evidence at the close of trial. Appellants do not claim that the district court strayed from the recommended procedure. Their first contention is that, in making its *Petrozziello* determination, the district court improperly considered the hearsay evidence itself; second, they argue that, whether or not hearsay evidence was properly considered, there was insufficient evidence to support the court's finding of conspiracy.

Appellants failed to make their first argument before the district court and thus have waived it. *Tarrant v. Ponte,* 751 F.2d 459, 461 n. 5 (1st Cir.1985). At the beginning of its *Petrozziello* findings, the district court stated: "I think we all agreed that in making this determination that I may consider hearsay statements that were made in determining whether the evidence should come in." Appellants did not object.

We have made exception for an argument not made below if it is "so compelling as virtually to insure appellant's success." *United States v. West,* 723 F.2d 1, 2 n. 1 (1st Cir.1983). As our following analysis reveals, this standard has not been approached.

In the instant case, the district court considered the hearsay itself in making its *Petrozziello* findings. This approach has been adopted by the Sixth Circuit, which has held that a court may rely on the challenged statements to support the existence of the conspiracy pursuant to which those statements were introduced. *United States v. Vinson,* 606 F.2d 149, 153 (6th Cir.1979); *United States v. Piccolo,* 723 F.2d 1234, 1240 & n. 1 (6th Cir.1983) (en banc). *See also* Weinstein's *Evidence* 104–44 (1982). In contrast, the other courts of appeals have admitted coconspirators' statements only upon a showing of a preponderance of independent evidence that a conspiracy existed. *Means v. United States,* — U.S. ——, 105 S.Ct. 541, 83 L.Ed.2d 429 (1984) (White and Brennan, JJ., dissenting from denial of certiorari).

Our opinions on this issue have been less than clear.[6] Because we are satisfied, on the basis of the independent, non-hearsay evidence, *see United States v. Nardi,* 633 F.2d 972, 974 (1st Cir.1980), that it was more likely than not that a conspiracy existed among the defendants and the declarants in this case, we need not decide whether our precedent has adopted the majority view. We also note that even though the district court stated that it would consider hearsay evidence, our review of its analysis shows, with one exception, conscientious attention to significant, independent, non-hearsay evidence.[7]

---

**6.** In *United States v. Martorano,* 561 F.2d 406 (1st Cir.1977), we stated that the policies and plain terms of the revised Fed.R.Evid. 104(a) seem to favor considering hearsay evidence in determining whether a conspiracy exists. We emphasized, however, that our opinion in that case "should not be understood as deciding anything about the continued viability" of the requirement that the proof of the existence of the conspiracy be independent of the statement seeking admission. *Id.* at 408.

In *United States v. Nardi,* 633 F.2d 972 (1st Cir.1980), we stated that co-conspirator hearsay may be admitted if the "court finds that the existence of a conspiracy in which the defendant participated is established by a preponderance of independent, non-hearsay evidence." *Id.* at 974. *See also United States v. Cranston,*

686 F.2d 56, 58 (1st Cir.1982) (finding "substantial independent, non-hearsay evidence").

We have, at times, read *Martorano* as permitting a review of the hearsay itself, but only after we found the independent, non-hearsay evidence "sufficient to show, more likely than not, that [the defendants] were part of the same conspiracy". *United States v. Crooks,* 766 F.2d 7, 11 (1st Cir.1985).

**7.** The sole exception involves Ellen Dodge's testimony about several statements made to her by Cynthia Silva, allegedly a friend of Andrews. We do not find significant, independent, non-hearsay evidence that Silva was a co-conspirator. The admission of her out-of-court statements, when viewed in light of all the evidence tending to show Andrews' involvement in the off-load, was clearly harmless beyond a reason-

Dodge, the government's chief witness, testified extensively about the entire off-load operation; he discussed its conception and his initial dealings with Andrews, the circumstances of the day preceding the off-load at the hotel, which included testimony about Johnston and Andrews, the off-load itself, which involved Johnston, Andrews, and Rist, and finally the financial dealings after the off-load, which involved all three appellants as well.[8] His testimony was largely corroborated by hotel records showing rooms rented to Dodge, Johnston, Andrews, and Rist among others, and telephone records involving Dodge, Andrews, Johnston, Rist, and Silva.[9] Additionally, Ellen Dodge testified about the entire operation, including significant testimony as to Andrews and Johnston. There was also testimony about the evidence seized at Johnston's mother-in-law's house and the actual records of bale numbers and weights

were in evidence. There were also two post-arrest statements by Rist, one to Andrews, and the other to an arresting officer.

Even if the district court considered the hearsay evidence itself, significant, independent, non-hearsay evidence supports its finding that it was more likely than not that a conspiracy existed and that the declarants and the defendants were members of this conspiracy when these statements were made and that the statements were made in furtherance of the conspiracy.

### 3. Evidence of Prior Bad Acts

Appellants argue that they were prejudiced by the government's repeated attempts to introduce evidence of their prior bad acts.[10] Despite the fact that the district court found such evidence inadmissible[11] and gave curative instructions to the

---

able doubt. *Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967).

**8.** Johnston also argues that the district court committed plain error by improperly assessing the credibility of Dodge and his wife. Their testimony, according to Johnston, was so unreliable as to render it unbelievable. It is clear that our role is not to assess the credibility of witnesses; that judgment is reserved for the trier of fact. *Nardi,* 633 F.2d 974. And the evidence here certainly provided a sufficient basis for the trier of fact to determine that Dodge and his wife were credible witnesses.

**9.** Appellants also argue that the district court erred in admitting the records of telephone calls; they argue that such records were irrelevant, prejudicial, and not authenticated. The evidence was relevant, and was more probative than prejudicial. The phone records of calls that the government witness testified had been made by or to the various members of the conspiracy during the organization of the off-load were relevant to show activity consistent with the course of the conspiracy as described by the government witness. *See United States v. Drougas,* 748 F.2d 8, 25 (1st Cir.1984). Appellant's authentication argument, resting on Fed. R.Evid. 901(b)(6), applies to telephone conversations, not records of telephone calls. *See Drougas,* 748 F.2d at 8.

**10.** Evidence that a defendant on trial for one crime has been involved in some other crime or bad act is inadmissible under Fed.R.Evid. 404(b) if it is introduced solely to prove that the defendant has the propensity to commit crimes

of the sort for which he is on trial. *United States v. Zeuli,* 725 F.2d 813, 816 (1st Cir.1984). Should the evidence prove relevant in any other way, however, it is admissible, subject only to the limitations of Rule 403. *United States v. Fosher,* 568 F.2d 207, 212 (1st Cir.1978).

**11.** Johnston also objects to certain "bad acts" evidence admitted into testimony by the trial judge. First, Johnston argues that the trial judge erred in permitting Dodge to testify that he and Johnston used cocaine at the hotel on the eve of the off-load. Second, he claims that the district court erred by admitting Dodge's testimony that he came to the police because he received death threats from individuals from other drug transactions.

The test of admissibility is committed primarily to the trial court, *United States v. Eatherton,* 519 F.2d 603, 611 (1st Cir.1975), and a trial court's ruling on admissibility will not be disturbed unless there is an abuse of discretion, *United States v. Sorrentino,* 726 F.2d 876, 886 (1st Cir.1984). The trial judge did not abuse her discretion by finding that the evidence of drug use was admissible to show the relationship between Dodge and Johnston, co-conspirators, on the night before the off-load, and to explain certain telephone calls made that night. Even clearer is the propriety of the court's decision to admit evidence of death threats received by Dodge. It can hardly be argued that this testimony was admitted to show appellants' prior bad acts. Dodge testified that the death threats did not come from the appellants or involve this off-load. Additionally, the testimony showed Dodge's motivation for turning to the police and testifying for the government.

jury to disregard what they had heard, appellants claim that the court erred in failing to grant a mistrial.

In her opening statement, the prosecutor said: "Michael Andrews was there in and out, although he was also, Dodge will tell you, the skipper, part of the time working on another load." During direct examination, Dodge testified that he and Andrews "had another boat that was due to be coming in at any time." The district court sustained Andrews' objection to this line of questioning, stating that "we will not go further into that." [12] Later in his testimony, Dodge stated:

> "I had taken a bale out of the van that was at my house and sent it to Provincetown to give to a captain so that he would take another boat out and pick up another load that was supposed to be coming in. And the boat was out to get it and I hadn't paid for the dock yet. So Michael (Andrews) was on the boat and I didn't want them coming in without everything having been paid from the previous load, otherwise we thought there would be difficulty in them landing at the same pier."

Again the court sustained defense counsel's objection, and asked the prosecutor whether it was "possible to have this witness testify without getting into a whole pile of totally irrelevant and really fairly prejudicial stuff?" After the prosecutor stated that she did not realize Dodge would answer as he did, the judge denied Andrews' motion for a mistrial, but warned that if similar evidence was again introduced, she would "very seriously consider renewed motions of this sort." The judge

then gave the jury curative instructions. Finally, appellants objected to what they claimed was a fourth reference to their bad acts.[13] The trial judge denied another motion for a mistrial, stating that this last comment did not necessarily refer to appellants' prior bad acts.[14]

Appellants claim that it was error to deny their motions for mistrial, because curative instructions could not cure the harm done by the prosecutor. We agree with the district court that the government's evidence of other off-loads was inadmissible. The issue here, then, is whether it was necessary to retry the case or whether a cautionary instruction was adequate. To require a new trial, we must conclude that, despite the trial judge's instruction, Dodge's comments about other off-loads was likely to have affected the trial's outcome. *Id.* at 885–86. We do not find that to be the case here.

■ Dodge's comments were isolated. The quoted remarks were the only such comments in the course of an eight-day trial, during which Dodge's testimony itself spanned four days. The limited extent of the comments "makes it less likely that the minds of the jurors would be so influenced by such incidental statements during the long trial that they would not appraise the evidence objectively and dispassionately." *United States v. Socony-Vacuum Oil Co.,* 310 U.S. 150, 240, 60 S.Ct. 811, 852, 84 L.Ed. 1129 (1939).

The trial judge gave an explicit cautionary instruction. She told the jury:

> "Members of the jury, this case concerns the question whether any one of the

---

**12.** Andrews claims that this statement by Dodge and the prosecutor's question that elicited it "violated the court's previous order" and the prosecutor's representation not to "delve into the inadmissible subject again". A review of the record reveals no such court order or representation by the prosecutor. Andrews also argues that the district court erred at this point by not giving curative instructions to the jury or granting a mistrial. Appellants did not ask for curative instructions or move for a mistrial at that point.

**13.** Dodge testified that "[t]he people I initially talked with were going along with me on certain people in this case and other cases that come to be."

**14.** At this point, however, the trial judge admonished the prosecutor:

> "I am very upset about that. There have been too many references to these defendants being involved in things other than this particular offense on which they have been charged. And I think its the obligation of the prosecutor to prep the witnesses sufficiently so that doesn't happen."

three defendants on trial participated in an off-load in Fairhaven; whether they agreed to violate the laws of the United States with respect to that off-load by importing marijuana or by possessing it with intent to distribute.

They are not involved in any other off-loads. As to the extent that the witness may have been involved, that's his business. But these defendants are not. And the only question before you is whether they were involved in an off-load in Fairhaven, as the witness has described, and whether they violated the laws of the United States in that respect.

This explicit instruction addressing the inadmissible evidence directly was sufficient to counteract any prejudice that may have flowed from Dodge's testimony. *See United States v. Capone,* 683 F.2d 582, 587 (1st Cir.1982).

Any remaining prejudice could not have affected the outcome of this case. The evidence against the appellants was very strong if the jury believed Dodge. His testimony was detailed, basically consistent, and well corroborated by other government evidence. The major reasons advanced for disbelieving Dodge—his extensive drug use, his inconsistent statements to authorities, and his personal interests in cooperating with the government in this case—were explored in detail and argued vigorously by appellants. In sum, the jury's verdicts could hardly have been the result of Dodge's isolated comments about other off-loads, but rather were based upon lengthy testimony and a reasonable belief that Dodge was credible. We therefore find that the government's attempt to introduce evidence about the other off-loads did not prejudice the appellants.

### 4. *Remaining Claims*

The remaining four claims we dispose of briefly. This does not mean that they were not legitimately raised or were insubstan-

tial, but only that at this juncture, after thorough consideration by the district court and by us after briefing and oral argument, our rejection of these claims stems from a straightforward application of existing law, our finding that the district court did not abuse its discretion, or that appellants suffered no prejudice.

■ Appellant claim that contrary to the holding in *Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194, 1196, 10 L.Ed.2d 215 (1963), the government withheld exculpatory evidence in the form of information about Dodge that could be used to impeach him, and promises offered to Ellen Dodge in exchange for her testimony. Even assuming this evidence was exculpatory and was initially withheld by the government,[15] we deal here with delayed disclosure, rather than nondisclosure. This information was not suppressed by the government, but was produced at trial. Where the appellants are confronted with delayed disclosure, reversal will be granted only if they were denied the opportunity to use the disclosed material effectively. *United States v. Drougas,* 748 F.2d 8, 23 (1st Cir. 1984); *United States v. Peters,* 732 F.2d 1004, 1009 (1st Cir.1984). Here, appellants' counsel were given ample opportunity to explore the information, and they utilized that opportunity thoroughly.

■ Appellants next claim that the district court committed reversible error in refusing to give Rist's requested instruction on reasonable doubt. Appellants do not claim error with the language that the court in fact used in its instruction, but claim that Rist's instruction contained the "preferred" language. While we have made clear that we would rather leave the "difficult art of instructing the jury on reasonable doubt in the capable hands of the district judge", *United States v. Indorato,* 628 F.2d 711, 721 (1st Cir.1980), we have indicated our uneasiness with certain forms of reasonable doubt instructions, *see, e.g., United States v. Drake,* 673 F.2d 15,

**15.** The government argues that of the five pieces of information allegedly withheld, the request for one was withdrawn by defense counsel, the second was not known to the government before trial, the third and fourth were not exculpa-

tory, and the fifth was fully disclosed before trial. Because we find no prejudice to the appellants due to the delayed disclosure of this information, we need not address the government's contention.

21 (1st Cir.1982). In this case, the trial judge's instruction included none of the language criticized in our cases or the opinions from other circuits. The instruction "adequately apprised the jury of the reasonable doubt standard". *Drake*, 673 F.2d at 21, and the court "need not give instructions in the precise form or language requested by the defendant." *United States v. Beltran*, 761 F.2d 1, 11 (1st Cir.1985).

■ Similar reasoning disposes of Rist's argument that the court erred in failing to give Rist's requested instruction on conspiracy, which read as follows:

> "You may not find that Rist joined the conspiracy, if any, solely on the basis of what witnesses testify they heard about Rist at times when Rist was not present or otherwise had no opportunity to protest or deny what was being said about him."

Yet Rist concedes that the similar instruction offered by the court was proper:

> "When you decide whether a particular defendant wilfully joined the conspiracy, look only at what defendant, that particular defendant, did or said, obviously, in the context of the whole, but only at what the defendant did or said in deciding whether he, himself, became a member of the conspiracy."

As we have said, the trial court need not follow the instructions offered by a party; if the court's instructions are "correct and cover the issues of the case, the judgment will not be disturbed". *United States v. Fusaro*, 708 F.2d 17, 22 (1st Cir.1983). We find no error in the district court's failure to give Rist's suggested instruction on conspiracy.

Finally, appellants argue that their motions for judgment of acquittal at the close of evidence should have been allowed. We will first dispose of Rist's argument: that without the evidence of the co-conspirators the government's proof was insufficient to sustain his conviction. Because we have found that the district court properly admitted the statements of his co-conspirators, his claim fails.

■ Andrews and Johnston claim that even considering the co-conspirators' testimony there was insufficient evidence to support their convictions. They base their argument on the premise that no rational trier of fact could have believed the government's chief witness, Dodge. As we have already discussed, determinations of the credibility of witnesses lie within the exclusive province of the jury. *Nardi*, 633 F.2d at 974. Here, the credibility of Dodge was extensively and effectively challenged by defense counsel, but it was not of such a nature as to make Dodge, as a matter of law, not credible. The evidence against appellants provided a sufficient basis for a rational trier of fact to find them guilty beyond a reasonable doubt.

For the reasons discussed above, *the judgment of the district court is affirmed.*